UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 20-03061-KAR |
| | ) | |
| JOHN RATHBUN | ) | |

**DEFENDANT'S OPPOSITION TO THE
GOVERNMENT'S MOTION TO REVOKE DETENTION ORDER [D.E. 6][1]**

The government argues that the Magistrate Judge erred in releasing Rathbun to home detention because the *proximity* of his home to the site of the alleged incident somehow creates a special danger to the community. D.E. 6 at 9. The government goes on to contend that the Magistrate Judge erred by even considering the COVID-19 pandemic and its effect on detention facilities like the Hampden County Jail. D.E. 6 at 10-11. The government's first argument fails in light of the actual conditions the Magistrate Judge imposed. The government's second argument, which faults the Magistrate Judge for considering how detention would endanger Rathbun's health at the height of the COVID-19 pandemic, is simply wrong.

**A. THE MAGISTRATE JUDGE'S DECISION PROPERLY FOLLOWED, AND IS CONSISTENT WITH, THE BAIL REFORM ACT**

The government does not argue, nor can it, that the Magistrate Judge misread the dictates of 18 U.S.C. § 3142, the Bail Reform Act. The Act mandates pretrial release on personal recognizance or an unsecured appearance bond unless the court determines that "such release will not reasonably assure" the person's appearance[2] or "will endanger the safety of any other

---

[1] The government has styled its pleading "Motion to Stay and Objection to Magistrate Judge's Pretrial Release Order" and cites to Fed. R. Crim. P. 59(a). D.E. 6 at 1. The government's motion is more properly brought pursuant to 18 U.S.C. § 3145(a), which permits the government to appeal a Magistrate Judge's release order by filing a motion for revocation in the district court. For purposes of this Opposition, the defendant construes the government's pleading is a motion to revoke the release order.

[2] The government assigns its risk of flight argument to a footnote. *See* D.E. 6 at 10, n.3. But it also candidly concedes, *see* D.E. 6 at 9, and as the Magistrate Judge noted when summarily rejecting the government's risk-of-

person or the community." Even if a court – as happened here – determines that personal recognizance or unsecured bond, without more, might endanger any other person or the community, the Bail Reform Act *still* mandates release, but subject to certain specified conditions. 18 U.S.C. § 3142(c). Conditions of release can include, among other conditions suggested by the Bail Reform Act, "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B)(xiv). The government bears the burden of demonstrating by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person." 18 U.S.C. § 3142(f).

Contrary to the government's claim that the Magistrate Judge's decision placed the defendant back into the "exact same circumstances" as before his arrest, D.E. 6 at 9, the release Order in fact mandates compliance with **twelve (12)** wide-ranging conditions. *See* Order Setting Conditions of Release [D.E. 8]. Most salient to reducing the already low risk of Rathbun committing a new offense, the Magistrate Judge ordered Rathbun's release to strict home incarceration monitored by a Probation Officer:

> You are restricted to your residence at all times except as preapproved by the court or your supervising Probation Officer, with home detention to be monitored by random telephone communications from the supervising Probation Officer at times and by use of electronic applications (e.g., FaceTime) to be determined in the discretion of the supervising Probation Officer.

*Id.* To further assure that Rathbun would fully adhere to this condition, the Magistrate Judge signed an arrest warrant to be held in abeyance, authorizing immediate arrest should Rathbun leave the residence at all. *Id.*

---

flight argument below, Rathbun has demonstrated strong ties family ties and lifetime residence in the community, rendering the risk of nonappearance exceedingly low. Rathbun does not face a mandatory minimum sentence. Like the government's motion, this Opposition will instead focus on whether the government has demonstrated by clear and convincing evidence that Rathbun's conditional release creates an unreasonable risk of danger to the community.

The combination of conditions imposed are more than sufficient to ensure the safety of the community. Even assuming probable cause to believe Rathbun participated in the acts alleged – an allegation he must be presumed innocent of for the purposes of bail, *see* 18 U.S.C.§ 3142(j) – the condition of home incarceration, constantly monitored by the Probation Department, reduces the risk of a similar incident to effectively zero.[3]

If those conditions were not enough – and they are far more than enough – the circumstances of the COVID-19 pandemic, in conjunction with the notoriety generated by Rathbun's Wednesday arrest,[4] further reduce the specific risk of dangerousness to Ruth's House cited by the government. Given the stay-at-home advisory now in effect across the state, it is frankly inconceivable that Rathbun would venture out into a lightly traveled world, where his alleged offense is widely known, with the certainty of arrest should he be virtually anywhere in the community, let alone in the vicinity of Ruth's House.[5]

In sum, the government failed to demonstrate by clear and convincing evidence that Rathbun presents an unreasonable risk of danger were he to be conditionally released. The Magistrate Judge neither erred in reaching that conclusion, nor in releasing him on the stringent conditions set forth in her Order.

---

[3] The government complains that "the release order does not require electronic monitoring and is entirely unsecured, even by a personal recognizance bond" and so "effectively places the defendant back into the exact same circumstances under which he had been living." D.E. 6 at 9. As the Court well knows, the substitution of random telephone monitoring rather than electronic monitoring for defendants on home detention and home incarceration is at the behest of the U.S. Probation Department because of strain on resources caused by the COVID-19 crisis. To be clear, the defendant is amenable to electronic monitoring to insure compliance with the home incarceration component of his release should the Court wish it.

[4] The U.S. Attorney's Office's press release trumpeting Rathbun's arrest, along with an arrest photo and photos of his home, has been widely disseminated in reports by newspaper, radio, and television outlets both locally and nationally. *See, e.g.,* https://www.nytimes.com/2020/04/16/us/massachusetts-bomb-jewish-nursing-home.html; https://www.bostonglobe.com/2020/04/15/metro/east-longmeadow-man-charged-attempted-arson-jewish-nursing-home/; https://www.masslive.com/news/2020/04/feds-appeal-judges-release-of-suspect-in-jewish-nursing-facility-arson-attempt-arguing-covid-19-interfered-with-ruling.html.

[5] Although it does not appear in the written Order, the Magistrate Judge additionally orally ordered that in the infrequent event of a preauthorized release for medical and other necessary appointments, Rathbun is prohibited from taking a route that would cross the vicinity of Ruth's House.

**B. THE MAGISTRATE JUDGE PROPERLY CONSIDERED THE COVID-19 OUTBREAK IN THE DETENTION CALCULUS**

The government further faults the Magistrate Judge for weighing the altered circumstances of detention during the ongoing public health crisis because "the COVID-19 pandemic is not a basis for release." D.E. 6 at 10. The government appears to alternatively argue that the Magistrate Judge elevated the reality of the pandemic's consequences above all other considerations when ordering Rathbun's release. *Id.* Both of the government's assertions are wrong. As the Magistrate Judge did here, courts nationwide are taking into account the significant consequences of the pandemic when making release decisions, and she properly weighed it as one of many factors, including the nature and circumstances of the offense.

**1. The COVID-19 Crisis and Its Effect on Prisons, Jails, and Detention Facilities**

**a. COVID-19's Nature and Circumstances**

The COVID-19 pandemic has changed life as we know it. Everyone, from children whose school year has been cut short, to the family members who are dying alone in our country's hospitals, has been affected by the pandemic in drastic ways. The number of confirmed cases of COVID-19 in Massachusetts stands at 32,181 and continues to rise exponentially; the number of deaths in the state has more than 800% in the last two weeks, from 154 to 1245. See Massachusetts Department of Public Health, *Coronavirus Disease 2019 (COVID-19) Cases in MA*, (Updated April 14, 2020), available at https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring#covid-19-cases-in-massachusetts. Confirmed cases of COVID-19 cases in Western Massachusetts are likewise rising at a dramatic rate. As of April 14, 2020, Franklin County has had 155 confirmed positive cases of COVID-19 and 25 deaths, resulting in a dramatically higher mortality rate (16.1%) than anywhere else in the Commonwealth.[6]

---

[6] Coronavirus in Massachusetts: Baker Administration says to brace for "difficult days" ahead as health officials announce 113 new deaths. MassLive.com, (April 14, 2020) available at

Hampshire County has 233 confirmed cases and, notably, the Hampshire County House of Corrections announced on April 10, 2020 an inmate had tested positive for COVID-19 and by April 14, 2020 the number of confirmed positives in that jail had risen to nine. *Id.* Hampden County, home to Baystate Hospital, the region's largest hospital and ICU had 1,798 confirmed cases with 134 reported deaths from COVID-19.

The Centers for Disease Control and Prevention ("CDC") advises that the coronavirus that causes COVID-19 passes through respiratory droplets when a person coughs, sneezes, or talks.[7] Droplets can land on another person's mouth or nose if they are in close contact (within about 6 feet).[8] It is also possible to catch the virus by touching a surface that has the virus on it and then touching one's mouth, nose, or eyes.[9] The available evidence indicates that the virus may remain on surfaces for up to three days.[10]

Infection can result in pneumonia, multi-organ failure, and in some cases, death.[11] While fatality rates are highest among those over age 75, there is no evidence that age plays a role in catching the virus. In fact, adults between ages 20 to 44 comprise 14-20% of adults requiring hospitalization from the virus.[12] The CDC has urged communities to "flatten the curve" so that

---

https://www.masslive.com/coronavirus/2020/04/coronavirus-in-massachusetts-bakeradministration-says-to-brace-for-difficult-days-ahead-as-health-officials-announce-113-newdeaths.html.

[7] *See* "How It Spreads," Center for Disease Control and Prevention (last accessed 03/21/2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[8] *Id.*

[9] *Id.*

[10] *See* Neeljte van Doremalen, et. al., *Aerosol and Surface Stability of SARS-CoV2 as Compared with SARS-COV-1*, New England Journal of Medicine (Mar. 17, 2020), https://www.nejm.org/doi/10.1056/NEJMc2004973 ("SARS-CoV-2 was more stable on plastic and stainless steel than on copper and cardboard, and viable virus was detected up to 72 hours after application to these surfaces (Figure 1A)…").

[11] CDC, "What You Need to Know About Coronavirus Disease 2019 (COVID-19)" Factsheet, https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=22&ved=2ahUKEwiUj_nK-ejoAhWtlnIEHfgGApQQFjAVegQIExAB&url=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fdownloads%2F2019-ncov-factsheet.pdf&usg=AOvVaw3L8vTk2-d0C8lqQ7mthGHs.

[12] CDC, "Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020," https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm#T1_down.

hospitals are not overwhelmed, which will hopefully result in fewer deaths overall.[13] Nonetheless, many young people have died from the virus in the United States, including at least 45 people in their twenties, some of whom had no comorbidities or health risk factors.[14]

To combat transmission, the CDC has urged social distancing – every person should remain at a distance of at least 6 feet from every other person.[15] It has issued guidance discouraging public gatherings of any size in areas where there is a substantial level of community transmission.[16] Proper hygiene, including frequent cleaning of all surfaces and frequent, thorough hand washing is also recommended. On April 3, 2020, the CDC issued new guidance recommending the general public to "wear[] cloth face coverings in public settings where other social distancing measures are difficult to maintain (e.g., grocery stores and pharmacies) *especially* in areas of significant community-based transmission."[17]

Leaders across the globe have mobilized to drastically limit the physical interaction of people and the spread of the virus. For example, in Massachusetts, Governor Charlie Baker has enacted emergency orders[18] to close all schools, prohibit on-site consumption of food and beverages, and restrict visitor access to nursing homes. On March 23, 2020, Governor Baker

---

[13] NY Times, "Flattening the Coronavirus Curve" (Mar. 27, 2020), https://www.nytimes.com/article/flatten-curve-coronavirus.html.

[14] Washington Post, "Hundreds of Young Americans Have Now Been Killed by the Coronavirus, Data Shows" (Apr. 8, 2020), https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/.

[15] *See* Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[16] CDC, Interim Guidance for Coronavirus Disease (Mar. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/mass-gatherings-ready-for-covid-19.html.

[17] CDC, Recommendations for Cloth Face Covers, Apr. 3, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[18] COVID-19 State of Emergency, https://www.mass.gov/info-details/covid-19-state-of-emergency.

ordered all non-essential businesses to close and directed the Department of Public Health to issue a stay-at-home advisory. That advisory has been extended until at least May 4, 2020.[19]

### b. COVID-19 and Detention/Incarceration

The measures necessary to mitigating the spread of COVID-19 are unavailable to incarcerated people or those who must interact with them. Akiyama, et al., *Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons,* New England Journal of Medicine ("Flattening the Curve"), Apr. 2, 2020, https://www.nejm.org/doi/full/10.1056/NEJMp2005687 ("Although correctional facilities face risks similar to those of community health care systems, social distancing is extremely challenging in these settings"). The large, confined population at a jail make it no better than a cruise ship[20] or nursing home[21] – places where the virus has run rampant. Due to close quarters and common spaces, and minimal provisions for healthcare and hygiene, jails are tinderboxes in which the COVID-19 virus can spread like wildfire, jeopardizing the life and safety of inmates.[22]

The Bureau of Prisons is reporting positive COVID-19 cases among staff and inmates at a shocking rate. The rate of increase of infected people has surpassed the national rate by an enormous degree:[23]

---

[19] The Hill, "Massachusetts Governor Extends Stay-At-Home Advisory Through May 4," Mar. 31, 2020, https://thehill.com/homenews/state-watch/490426-massachusetts-governor-extends-stay-at-home-advisory-through-may-4.

[20] CDC, COVID-19 and Cruise Ship Travel (last accessed March 21, 2020), https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship.

[21] Los Angeles Times, Seattle-Area Nursing Home Deaths Jump to 13 with COVID-19 and 11 of Unknown Causes, https://www.latimes.com/world-nation/story/2020-03-07/nursing-home-coronavirus-deaths.

[22] Medical professionals behind bars are sounding the alarm. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . .Please let as many out as you possibly can."). *See also* Jennifer Grannerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020).

[23] Graph created by the Federal Defenders of New York, available at https://federaldefendersny.org/.



The BOP has so far reported **18 federal inmate deaths**, and currently 537 federal inmates and 302 BOP staff members who have tested positive for COVID-19.[24] The BOP's reported numbers of positive tests are almost certainly lower than the actual number of inmates and staff members who are infected. This is because the BOP has not instituted mass testing for the coronavirus, and tests remain scarce. For example, the federal penitentiary in Terre Haute, Indiana, which houses between 2,500 and 3,000 inmates, received only four tests as of late

---

[24] Federal Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/index.jsp.

March.[25] At the federal prison in Oakdale, Louisiana, where at least six inmates have died and dozens have tested positive, "correctional officers were told to stop testing people and just assume that anyone with symptoms had been infected[.]"[26] The director of the CDC has reported, however, that as many as 25% of people infected with the coronavirus may not show any symptoms.[27] To illustrate this point: After an inmate tested positive at an Arkansas state prison around April 11, 2020, the corrections department tested all the other inmates housed in that unit. "The state corrections department announced that a whopping 43 of the 46 other men in the housing unit had tested positive. They were all asymptomatic and are now quarantined."[28]

To date, every Massachusetts jail save Dukes County have already reported positive cases among either staff, inmates/detainees, or both. American Civil Liberties Union of Massachusetts, *Tracking COVID-19 in Massachusetts Prison & Jails*, https://data.aclum.org/sjc-12926-tracker/. The data – which is self-reported and so likely understates the actual total – indicate that across all jails and prisons, 319 detainees, prisoners, and staff have tested positive for COVID-19. *Id.* At the Massachusetts Treatment Center in Bridgewater, 37 inmates have tested positive and four have died from the virus. See Becker, Deborah, "*More Than 150 Positive COVID-19 Cases Reported Among Prisoners, Staff Inside Mass. Jails and Prisons*" (updated April 15, 2020), https://www.wbur.org/news/2020/04/15/jails-prisons-latest-coronavirus-cases-mtc.

---

[25] Mother Jones, "Want to Know How Fast Coronavirus Can Spread in Prison? Look at Arkansas," Apr. 13, 2020, https://www.motherjones.com/coronavirus-updates/2020/04/cummins-unit-prison-arkansas-coronavirus-spread/.

[26] *Id.*

[27] NY Times, "Infected But Feeling Fine: The Unwitting Coronavirus Spreaders," Apr. 1, 2020, https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[28] *See supra* n.25.

Other state prisons that have widely tested their populations have reported astronomical rates of infection. The New York Times reported on April 8, 2020[29] that the Cook County Jail in Chicago is the largest known source of infections in the United States:

> At least 353 cases can be linked to the jail — more than have been connected to the U.S.S. Theodore Roosevelt; a nursing home in Kirkland, Wash.; or the cluster centered in New Rochelle, N.Y.
>
> The Cook County Sheriff's Office, which operates the jail, said 238 inmates and 115 staff members had tested positive as of Wednesday.

Additionally, on Rikers Island in New York, more than 700 people have tested positive, including over 440 staff members. One inmate, who was being held on a technical parole violation, died at the jail. In addition, at least six correctional officers have died.[30] The most significant difference between the BOP facilities and these state prisons is in the number of people who have been tested.

Read with this context, the government's contention that all is fine at the Hampden County Jail and House of Correction because of the precautionary measures the jail has put in place, *see* D.E. 6 at 10, dissolves. The conditions at the facility are no different than the conditions of Rikers or Cook County Jail. Inmates are still sharing cells and common areas, including eating meals together. The Hampden County Jail and House of Correction presently houses 831 male prisoners. It houses pretrial and sentenced state court defendants as well as those in the custody of the United States Marshals Service and a smattering of other agencies. As of April 16, 2020, the jail reports having tested just 31 of its staff and inmates. *Tracking COVID-19 in Massachusetts Prison & Jails*, *supra*. Of the 31 persons tested, an alarmingly high **nine (9)**

---

[29] NY Times, "A Jail in Chicago is Now the Largest-Known Source of U.S. Infections," Apr. 8, 2020, https://www.nytimes.com/2020/04/08/us/coronavirus-live-updates.html?action=click&module=Spotlight&pgtype=Homepage#link-7634e187.

[30] Newsweek, "More than 700 People Have Tested Positive for Coronavirus on Rikers Island, Including Over 440 Staff," Apr. 8, 2020, https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

**persons, all staff members,** have tested positive for the virus.[31] And entirely unknown is the number of inmates who are reporting symptoms consistent with COVID-19 or otherwise quarantined.

The fact that the facility has yet to actively report a positive coronavirus test among the inmate population does not mean that no inmates are in fact infected. It does not mean that inmates at the facility have better means of maintaining social distancing or sanitation. It does not mean that the facility has the capacity for mass testing or adequate medical care. It does not mean that inmates at the Hampden County Jail and House of Correction are any safer than inmates at facilities that are experiencing mass outbreaks.

### c. The Federal Courts' Response Features a Changed Calculus for Release/Detention Decisions

Contrary to the government's argument that the pandemic is not a "basis" for considering release, federal courts nationwide are changing the detention calculus to recognize the risk posed by COVID-19 and are releasing defendants, even those previously detained. *See United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, Dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has

---

[31] The Federal Defender Office has compiled declarations from doctors specializing in epidemiology and/or infectious diseases about the particular problems that COVID-19 pose in an incarcerated setting, and the particular problems that such institutions have in mitigating and reducing the spread of infection. See, e.g., Declaration of Dr. Jaimie Meyer, attached as Exhibit A; Declaration of Professor Chris Beyrer, attached as Exhibit B; Declaration of Professor Danielle Ompad, attached as Exhibit C. Should the Court be inclined to credit the government's assertion that the Hampden County Jail is different and so will be immune to the COVID-19 virus, defendant suggests that an evidentiary hearing, at which a representative of the Hampden County jail can testify and be subject to cross examination, is warranted.

demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).) *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (*sua sponte* inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic").

Judges in this court have recognized the dire risk of detention during this pandemic by releasing pretrial detainees to mitigate their risk of severe illness or death. On April 14, 2020, Magistrate-Judge Kelley granted a pretrial detainee's motion for reconsideration of her detention order, allowing temporary release from Wyatt to home confinement for 60 days. *See United States v. Greenan*, No. 1:19-cr-10327, Dkt. No. 44 (D. Mass. April 14, 2020). Like Rathbun, the individual had no underlying medical conditions. She is charged with wire fraud and filing false tax returns for allegedly embezzling money while working as a bookkeeper. The parties agreed to her release on conditions. After she was fired and got a new job, and was charged in federal

court, she allegedly embezzled money from her new job and had her initial release revoked. Upon her recent motion for reconsideration, Magistrate Judge Kelley granted temporary release over the government's objection, verbally recognizing that Wyatt Detention Facility, like all other detention facilities, is not set up to deal with the highly contagious coronavirus. Judge Kelley noted on the record her concerns about the lack of medical personnel at Wyatt who could monitor symptoms and the impossibility of sheltering-in-place in a jail setting.

Similarly, on April 10, 2020, in United States v. Nunez, No. 1:19-cr-10316-LTS (D. Mass. April 10, 2020) (docket entry pending), Magistrate-Judge Bowler released a pretrial detainee who has no medical issues over objections from the government and the Probation Department. The individual is charged with conspiracy to distribute and to possess with intent to distribute 400 grams or more of fentanyl, and two related distribution counts. He had originally agreed to voluntary detention without prejudice.

And, of course, this Court has recognized the consequences of the pandemic by recently releasing two individuals, one serving a sentence after conviction and one previously ordered detained to avoid the perils of COVID-19. *See United States v. Capelton*, No. 3:00-cr-30027-MGM, Dkt. No. 539 (D. Mass. April 10, 2020) (granting compassionate release to defendant housed at MDC Brooklyn, over objection by the government). *United States v. Brantley*, No. 16-30044-MGM (D. Mass. April 15, 2020) (over government's objection, releasing defendant at some risk of health issues amid rapid uptick in COVID-19 positives and Hampshire County Jail).

The reality is that the COVID-19 virus continues to spread and defendants in detention are far more susceptible to catching, spreading, and falling ill to it. The Magistrate Judge's consideration of the risk posed by sending Rathbun into detention where an appropriate alternative existed was not only appropriate under the Bail Reform Act, but manifestly prudent to protect the safety of the community.

## 2. The Magistrate Judge Did Not Elevate Consideration of the Pandemic's Consequences Above All Others When Ordering Rathbun's Release; Rather, She Properly Weighed the Factor When Considering the Safety of Any Other Person and the Community

The government's Motion asserts that the Magistrate Judge "appears to have been greatly influenced by the ongoing COVID-19 pandemic." D.E. 6 at 10. Rathbun submits, as an initial matter, that the government's characterization of the Magistrate Judge being "greatly influenced" by the pandemic is unsupported by the record.[32] Despite the government's repeated attempts to magnify the role the pandemic played in the Magistrate Judge's decision once she announced it at the hearing, the Magistrate Judge expressly countered that the consequences of the pandemic was but one of the factors she had considered in deciding to order release.

The record belies the government's claim that the Magistrate Judge gave outsized consideration to the pandemic consequences. Instead, she properly considered and balanced all of the factors mandated by the Bail Reform Act. Indeed, she credited the government's argument that the offense was serious and manifestly troubling.[33] Likewise she credited the significant strength of the evidence against Rathbun. But the weight of the evidence against the accused is but one factor to be considered at the detention hearing and is arguably the least significant factor in the release analysis. *See United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); *United States v. Apker*, 964 F.2d 742, 744 (8th Cir. 1992). The Magistrate Judge took into account, as she must, Rathbun's history and characteristics, which included (among other things):

---

[32] Like the government, see D.E. 6 at 2 n.1, the defendant is filing this opposition without benefit of a transcript of the detention hearing or a written memorandum documenting the Magistrate Judge's release decision. Rathbun reserves the right to supplement this opposition should the Court decide to entertain the government's motion beyond the present pleadings.

[33] As noted, the defendant denied any involvement in placing a gas can at the site of Ruth's House. In addition, the defendant vehemently denied ties to or involvement with any white supremacist organization or activities. The government's complaint candidly admits that it has no evidence of that Rathbun had ties or involvement to any such organization or activity, notwithstanding the lurid allegations set forth in ¶¶ 9-13 of the complaint. D.E. 1 at 6, n.1.

- Rathbun's lifetime residence in the Springfield area, with the bulk of it spent at his parents' home, the address to which he was to be released;

- His strong family ties, including his role as the joint caretaker of a 17-year-old;

- His long work history as a skilled electrician;

- His consistent history of appearing in court on past offenses; and

- His past compliance on probation supervision.

Most importantly, as outlined above, she considered "the nature and seriousness of the danger to any person or the community that would be imposed by the defendant's release" by weighing the danger posed by placing Rathbun in detention with an elevated risk of harm to his health and that of others, alongside the risk of danger minimized by the release on strict conditions. 18 U.S.C. § 3142(g)(4). This was proper, as was the Magistrate Judge's overall consideration and balancing of the Bail Reform Act's factors when crafting her release Order and attendant conditions.

## **CONCLUSION**

For the foregoing reasons, this Court should decline to revoke the Magistrate Judge's Order conditionally releasing Rathbun to his home.

JOHN RATHBUN
By his attorney,

/s/ Timothy G. Watkins
Timothy G. Watkins
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

## **CERTIFICATE OF SERVICE**

      I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 17, 2020.

                                            /s/ Timothy G. Watkins
                                            Timothy G. Watkins