1                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2                     WESTERN SECTION

3

4     UNITED STATES        *        Docket No. 20-MJ-03061

5
      VS.                  *        Springfield, MA
6

7     JOHN RATHBUN         *        April 29, 2020

8     *    *    *    *    *        12:40 p.m.

9

10
              EXCERPT OF THE VIDEOCONFERENCE HELD
11        BEFORE THE HONORABLE KATHERINE A. ROBERTSON,
              UNITED STATES MAGISTRATE COURT JUDGE.
12

13

14

15
      APPEARANCES:
16    For the Government:  STEVEN H. BRESLOW, Assistant
          U.S. Attorney, 300 State Street, Springfield,
17        Massachusetts 01105.

18        RISA BERKOWER, Assistant U.S. Attorney,
          950 Pennsylvania Avenue NW, Washington, D.C.
19        20532.

20    For the Defendant:  TIMOTHY G. WATKINS, ESQUIRE,
          Federal Public Defender Office, 51 Sleeper
21        Street, 5th Floor, Boston, Massachusetts 02210.

22

23

24
                      Sarah L. Mubarek
25            Registered Professional Reporter

1                        I N D E X

2

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEREK BOUCHER | | | | |
| (By Mr. Breslow) | 3 | | 97 | |
| (By Mr. Watkins) | | 45 | | 103 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. Breslow, I will turn

2    this over to you.  The government may call its first

3    witness.

4          MR. BRESLOW:  Your Honor, we'll

5    reserve argument for after Special Agent Boucher has

6    concluded his testimony and left the virtual

7    courtroom.

8          THE COURT:  Thank you.

9          MR. BRESLOW:  What we're going to

10   plan to do is I'll conduct the direct and redirect

11   of the special agent, and then Ms. Berkower will

12   conduct the oral argument following his testimony.

13          THE COURT:  That's fine.  Thank you.

14   Ms. Rivera, why don't you swear in Agent Boucher.

15          THE CLERK:  Yes, your Honor.

16          The witness, DEREK BOUCHER, having been

17   duly sworn, testifies as follows:

18          THE COURT:  Proceed, Mr. Breslow.

19          MR. BRESLOW:  Yes, your Honor.

20          DIRECT EXAMINATION BY MR. BRESLOW

21     Q.    Can you please state your name and spell

22   it for the record?

23     A.    Derek Boucher, D-e-r-e-k, B-o-u-c-h-e-r.

24     Q.    How are you employed?

25     A.    I'm an FBI special agent.

1          Q.      How long have you been employed as a
2     special agent with the FBI?
3          A.      Since 2006.
4          Q.      Where are you currently assigned?
5          A.      I'm assigned to the Springfield FBI
6     office in Massachusetts.
7          Q.      And what is your current assignment?
8          A.      I'm a special agent on the Joint
9     Terrorism Task Force.
10          Q.      Please describe briefly for the Court
11     what the Joint Terrorism Task Force is.
12          A.      The Joint Terrorism Task Force is an
13     FBI-led task force which includes other federal,
14     state, local police agencies, which primary
15     responsibility is to investigate terrorism.
16          Q.      Is that both domestic and international?
17          A.      Yes, it is.
18          Q.      Are you familiar with the FBI's
19     investigation of the defendant, John M. Rathbun?
20          A.      Yes, I am.
21          Q.      Are you the case agent?
22          A.      No, I'm not.
23          Q.      Who is the case agent?
24          A.      Ryan McGonigle.
25          Q.      Please describe for the Court your own

1    personal involvement, if any, in the FBI's

2    investigation of Mr. Rathbun.

3         A.    I've been involved in running database

4    checks, open source research, meetings virtually and

5    telephonically in preparation for this preliminary

6    hearing, and I've also been involved in the

7    perimeter security and surveillance of the search of

8    the defendant's residence on April 15th.

9         Q.    By open source research, what do you

10   mean?

11        A.    I conducted a review of Google Maps and

12   some general research on JGS, the company which owns

13   the property that the device was placed in.

14        Q.    Would that include, among other things,

15   reviewing websites that are publicly available?

16        A.    Yes, that is correct.

17        Q.    And did you in fact create two exhibits,

18   Government Exhibits 9 and 10, based on your open

19   source research using Google Maps?

20        A.    Yes, I did.

21        Q.    Other than what you've just identified,

22   do you have any other involvement in the

23   investigation?

24        A.    No, I do not.

25        Q.    What have you read to prepare for your

1      testimony today?

2          A.     I've read the criminal complaint,

3      corresponding affidavit.  I've read an affidavit by

4      the gas company, Scepter, the canister company.

5      I've read the search warrant affidavit.  I've read

6      the Longmeadow Police Department report, and I've

7      read multiple Massachusetts State Police Crime Lab

8      reports.

9          Q.     In addition have you read what's called

10     an FD-302, commonly known as a report of the

11     defendant's interview on April 15th?

12         A.     Yes, I read that as well.

13             MR. BRESLOW:  I want to focus now on

14     Government Exhibit 1, which is already in evidence.

15     Your Honor, I'm going to share my screen so that the

16     Court can see this item as well.

17             THE COURT:  All right.  Just so you

18     know, Mr. Breslow, I actually have copies of the

19     majority of the exhibits.

20             MR. BRESLOW:  Okay.

21             THE COURT:  The other participants

22     won't be able to see the exhibits.  So I think if

23     you want to point to any particular aspect, it may

24     be helpful to show that on your screen, but

25     understand that I am able to follow on a paper copy.

```
 1                    MR. BRESLOW:  Okay.  Mr. Watkins, are
 2         you able to do the same?
 3                    MR. WATKINS:  As far as what?  I'm
 4         not understanding.
 5                    MR. BRESLOW:  Well, I offered to
 6         share my screen and display the exhibit on the
 7         screen.  The Court indicated that she has paper
 8         copies of nearly every exhibit.  What I'm asking you
 9         is, I know you have digital copies of all of the
10         exhibits, but can you follow along without me
11         sharing the screen or would you prefer me to share
12         the screen?
13                    MR. WATKINS:  Yes, I can follow along
14         without the screen.
15                    MR. BRESLOW:  Okay.  If at any point
16         Mr. Watkins or your Honor would like me to share the
17         screen, I'm happy to do that.  I believe that the
18         agent has copies of all the exhibits as well at his
19         desk.
20                    THE WITNESS:  That is correct.
21         Q.    So I'm focusing you now on Government
22         Exhibit 1.  What is it?
23         A.    This is a criminal complaint and
24         corresponding affidavit, signed April 15th, 2020,
25         with the defendant being John Rathbun.
```

1      Q.      And who was the affiant?

2      A.      Special Agent Ryan McGonigle.

3      Q.      And that is the person that you

4  identified as the case agent for the FBI of this

5  investigation?

6      A.      That is correct.

7      Q.      I want to focus you on paragraph 18,

8  which is on page six of the complaint.

9      A.      Okay.

10      Q.      On April 2nd, 2020, what did the

11  Longmeadow Police Department discover at the

12  entrance of Ruth's House?

13      A.      The Longmeadow Police Department

14  discovered a homemade incendiary device at the

15  entrance of Ruth's House.

16      Q.      And what time approximately did the LPD

17  discover the device?

18      A.      At approximately 10 a.m. on April 2nd.

19      Q.      Where approximately did the LPD discover

20  the device?  Where was it located?

21      A.      It was at the entrance of Ruth's House,

22  located within a few feet of a widely used

23  pedestrian walkway on Converse Street.

24      Q.      And how did Special Agent McGonigle

25  describe Converse Street in particular?

1    A.    He described Converse Street as a very

2    busy main road in Longmeadow, and approximately 50

3    yards away from Ruth's House.

4    Q.    So the device itself was located at the

5    entrance, but approximately 50 yards away from the

6    facility?

7    A.    Yes, that is correct.

8    Q.    Focusing you on paragraph 19, what other

9    Jewish institutions and facilities are located in

10   the near vicinity of Ruth's House?

11   A.    Three Jewish temples, a Jewish private

12   school, and a Jewish community center are within

13   approximately one square mile of Ruth's House and

14   where the device was placed.

15   Q.    I want to focus you now on paragraph 20

16   which is on the following page, seven.  What did the

17   device consist of?

18   A.    The incendiary device consisted of a

19   five-gallon plastic Scepter gas canister filed with

20   liquid believed to be flammable gas, along with

21   burnt paper placed in the nozzle of the canister.

22   Q.    And what was the burnt paper later

23   identified to be?

24   A.    The burnt paper was later identified to

25   be a Christian religious pamphlet.

1    Q.    And is Scepter a common and widely
2    distributed brand of gasoline and diesel containers?
3    A.    Yes, they are.  They're sold in a variety
4    of stores located throughout the United States,
5    including Home Depot and Lowe's and stores like
6    that.
7    Q.    Okay.  Again focusing on paragraph 20,
8    what did the Longmeadow Police Department observe
9    with respect to both the canister and the pamphlet?
10    A.    The Longmeadow Police Department observed
11    that there appeared to be bloodstains both on the
12    canister handle and on the Christian pamphlet.
13    Q.    And what did the police department do
14    with respect to both the canister and the pamphlet?
15    A.    The Longmeadow Police Department
16    transferred the canister and the pamphlet to the
17    Massachusetts crime lab in Springfield.
18    Q.    And on April 6th, 2020, what did the
19    crime lab do with the suspected bloodstains on both
20    the canister and the pamphlet?
21    A.    The crime lab tested the samples of the
22    stains on both the canister and the pamphlet, and
23    determined that the samples are human blood.  The
24    crime lab identified a male DNA profile from each of
25    the samples.

1    Q.    On April 9th, 2020, what did the MSP

2    Crime Lab determine with respect to each of the male

3    DNA profiles taken from both samples?

4    A.    The crime lab determined that the DNA

5    profile left on the gas can and the pamphlet were

6    linked to the DNA profile of Rathbun.

7    Q.    And how did the crime lab make that match

8    or that link?

9    A.    The Massachusetts State Police Crime Lab

10   confirmed the DNA match through a search of the

11   Consolidated DNA Index System or CODIS.

12   Q.    What is CODIS?

13   A.    CODIS is an FBI database that stores

14   convicted offender and arrestee DNA profiles, and

15   allows state, local or federal agencies the ability

16   to search the genetic DNA profile of an unidentified

17   subject.

18   Q.    Focusing on paragraph 23, without going

19   into detail, according to Mr. Rathbun's criminal

20   history records, did he have a number of arrests and

21   convictions that would have resulted in his DNA

22   being taken from him and placed into the CODIS

23   database?

24   A.    Yes, he had.

25                MR. BRESLOW:  Your Honor, I want the

1   record to reflect that the dog barking is not coming

2   from my home.

3             THE COURT:  All right.

4        Q.   I want to focus you now on April 11th,

5   2020.

6        A.   Yes.

7        Q.   Paragraph 24.  On that day what did this

8   Court, meaning Magistrate Judge Robertson,

9   authorize?

10       A.   A search warrant for Rathbun's person,

11   his residence in East Longmeadow, and three vehicles

12   that were registered to his mother.

13       Q.   And where did his mother live?

14       A.   At 20 Lori Lane in East Longmeadow with

15   the defendant.

16       Q.   And we'll just call that the residence

17   for short.

18       A.   Okay.

19       Q.   Focusing on paragraph 25, when did the

20   FBI execute the search warrants for Mr. Rathbun's

21   residence, the three vehicles located there and his

22   person?

23       A.   On April 15th at approximately 7:45 a.m.

24       Q.   Did you, sir, participate in the search?

25       A.   No, I did not.

1      Q.     What did you do, if anything, that day
2   regarding the search?
3      A.     I was involved in the surveillance prior
4   to the search, and also the perimeter security while
5   the search was ongoing.
6      Q.     Did Special Agent McGonigle participate
7   in the search activities that day?
8      A.     Yes, he did.
9      Q.     Again focusing you on paragraph 25, who
10   did Special Agent McGonigle locate and interview
11   during the search?
12      A.     The defendant.
13      Q.     Before interviewing the defendant, what
14   did Special Agent McGonigle do to ensure that
15   Mr. Rathbun understood his Miranda rights?
16      A.     He was advised of those rights, which he
17   waived both orally and in writing.
18      Q.     What did Special Agent McGonigle observe
19   regarding Mr. Rathbun's hands?
20      A.     He had observed that there were numerous
21   cuts or wounds in various states of freshness,
22   including an open wound on his right thumb.
23      Q.     What did Special Agent McGonigle and
24   other agents locate in the residence, both on the
25   porch and in the shed?

1       A.      They observed a large plastic gas

2   canister on the porch, and then other agents located

3   additional gas canisters in the shed.

4       Q.      After Mr. Rathbun waived his Miranda

5   rights, what did he agree to do?

6       A.      He agreed to be interviewed.

7       Q.      Who else participated in the interview?

8       A.      Officer Pamela Chaplin from the

9   Longmeadow Police.

10      Q.      I'm not going to focus you on every

11  statement that the defendant made as set forth in

12  the complaint, but just a few.  Please focus on

13  paragraph 25A, sir.  What did Mr. Rathbun say to the

14  officers regarding his morning routine?

15      A.      He noted that he routinely gets up at

16  approximately 6 a.m., and drives on Converse Street

17  past the Jewish school in Longmeadow each morning on

18  his way to a methadone clinic.

19      Q.      And focusing you on paragraph 25, what

20  did Mr. Rathbun say regarding his own drug use?

21      A.      He initially stated that he last used

22  drugs approximately one month ago, but later in the

23  interview he admitted he used drugs, including

24  cocaine, approximately two weeks prior.  Then

25  further in the interview he agreed to take a drug

1    test, but noted that he would test positive because

2    he had used a small amount of drugs the night prior

3    to the interview.

4         Q.    I want to focus you on paragraph 25G.

5    What did Mr. Rathbun say about the gas canisters

6    that were found at the residence?

7         A.    That he and his family never had --

8         Q.    Special Agent Boucher, I just want to

9    orient you.  I'm asking you about subparagraph G,

10   which is located at the bottom of page nine, but

11   primarily continues on page ten of the pdf.

12        A.    I see that.  Which subsection under G

13   though are you referring to?

14        Q.    One through four.

15        A.    Okay.  The can on the porch contained a

16   50/50 mix of gasoline and another substance used for

17   a leaf blower.  The cans in the shed contained

18   gasoline which was used for a lawnmower, and that

19   his mother obtained the gasoline approximately three

20   weeks ago from a gas station, and that his family

21   never had a yellow gas canister.

22        Q.    Please focus on paragraph H.  What, if

23   anything, did Mr. Rathbun say concerning the device

24   that was found at the entrance to Ruth's House?

25        A.    He denied placing any kind of explosive

1    device at the entrance to Ruth's House, and when he

2    was informed that his blood was on the gas can, he

3    could not explain how this was possible.

4         Q.    With respect to subparagraph I, what did

5    Mr. Rathbun say with regard to his mother's

6    religious activities?

7         A.    He noted that his mother was involved in

8    a local church and distributed Christian

9    proselytizing pamphlets.

10        Q.    And did other agents, meaning other than

11   Special Agent McGonigle, interview Mr. Rathbun's

12   mother also that day?

13        A.    Yes.

14        Q.    And what did she say regarding her own

15   activity regarding religious pamphlets?

16        A.    She stated to other agents that she

17   printed her own pamphlets to distribute to the

18   public.

19        Q.    What else did she say?

20        A.    But she did not recognize the pamphlet

21   that was found in the incendiary device at Ruth's

22   House.

23        Q.    Lastly with respect to the complaint,

24   could you focus on paragraph 25J.  Did the agents,

25   meaning Special Agent McGonigle and Police Officer

1   Chaplin, ask Mr. Rathbun whether he knew anything
2   about the device that was placed at Ruth's House?
3        A.    Yes.
4        Q.    Did they present him with photographs of
5   the bloodstained Christian pamphlet?
6        A.    They did.
7        Q.    And inform him that his DNA had matched?
8        A.    They did so.
9        Q.    How did Mr. Rathbun react or respond?
10       A.    His demeanor visibly changed, and a short
11   while later he stated he did know what he was going
12   to do and wanted to cry.
13       Q.    I'm going to ask you to turn away from
14   Government Exhibit 1 now, and focus on Government
15   Exhibit 2 which is already admitted into evidence.
16       A.    Okay.
17       Q.    What is Government Exhibit 2?
18       A.    It's a Longmeadow Police Department
19   incident report, incident number 20-LON-288-OF.
20       Q.    And the date of the incident report?
21       A.    April 2nd, 2020.
22       Q.    Is this the Longmeadow Police Department
23   report that's referenced in the complaint about
24   which you just testified?
25       A.    Yes, it is.

1        Q.    And does it contain narratives of, among

2   other people, Patrolman Matthew Chaplin and Patrol

3   Officer Pamela Chaplin?

4        A.    Yes, that is correct.

5        Q.    I want to focus you at the top of page

6   three, and with respect to this document two, I'm

7   referring, to the extent that there's any

8   discrepancy, to the third page of the actual pdf

9   file.

10       A.    Okay.

11       Q.    So this for reference is the personal

12   narrative for Patrolman Matthew Chaplin.  At the top

13   it indicates this is page one, meaning page one of

14   the narrative, but for the record we're focused on

15   page three of the nine-page document that is

16   Government Exhibit 2.  According to this narrative,

17   who arrived on the scene before Patrol Officer

18   Matthew Chaplin?

19       A.    The Longmeadow Fire Department arrived

20   prior to his arrival.

21       Q.    And in particular who did Officer Chaplin

22   interact with from the Longmeadow Fire Department?

23       A.    He interacted with Captain Nothe.

24       Q.    What did Captain Nothe inform Police

25   Officer Chaplin concerning the device?

1       A.      He informed the officer that a yellow

2   five-gallon gas canister which was located near the

3   sidewalk to the entrance of the Ruth's House at

4   Converse Street had burnt paper protruding from the

5   opening and smelled of gasoline, and he stated it

6   appeared to be a Molotov cocktail.

7       Q.      And do you understand based upon your

8   training, experience and general knowledge what a

9   Molotov cocktail is?

10      A.      Yes, I do.

11      Q.      Can you explain to the Court generally

12  what a Molotov cocktail is?

13      A.      It is an explosive or incendiary device

14  that is filed with flammable material, in this case

15  liquid, in a breakable container that can be thrown.

16      Q.      I'm focusing you now on page four of

17  Government Exhibit 2.  This is a personal narrative

18  for Detective Ewen MacEachern.

19      A.      Yeah.

20      Q.      M-a-c-e-a-c-h-e-r-n.  Focusing you on the

21  first paragraph, Special Agent Boucher, according to

22  the reporting party, meaning the party who first

23  reported to the police the gas canister, when did

24  she first notice the gas canister?

25      A.      She noticed the yellow gas canister that

1   morning between 8 and 9 a.m. as she was making

2   breakfast.

3        Q.   And focusing you on the third paragraph

4   from the bottom of page four, who is Raisa Ilina,

5   R-a-i-s-a, I-l-i-n-a?

6        A.   She's a resident of Genesis House, which

7   is located on the property, and she walks along the

8   property every morning.

9        Q.   And according to Ms. Ilina, did she or

10  did she not notice the container during her walk

11  that morning?

12       A.   She did not notice the canister that

13  morning during her walk.

14       Q.   I want to focus you on the first two

15  paragraphs of page five, the following page.

16  Regarding the top paragraph, this is a supplemental

17  narrative for Police Officer Pamela J. Chaplin, and

18  just for reference, is this the same officer who

19  conducted the interview of the defendant with

20  Special Agent McGonigle on April 15th?

21       A.   Yes, it is.

22       Q.   Focusing you on the top two paragraphs,

23  what did Police Officer Pamela Chaplin do when she

24  arrived on scene at the direction of her captain?

25       A.   She was requested to take photographs,

1   which she did so.

2        Q.    And are those photographs attached to the

3   final three pages of the report?

4        A.    Yes, they are.

5        Q.    We'll get to them in a moment.  How did

6   Police Officer Chaplin observe the device, focusing

7   on paragraph two now?

8        A.    She observed the yellow Scepter diesel

9   five-gallon gas canister which contained an unknown

10  liquid placed in the dirt next to the tree.  She

11  also observed burnt paper stuffed in the spout of

12  the can, and a quick look at the yellow gas can

13  showed her that there was a bloodstain on the

14  handle.

15       Q.    Now, just to be clear, she didn't confirm

16  that this was a bloodstain, but it appeared to her

17  to be a bloodstain based on her observation?

18       A.    Based on the narrative here, the words

19  she used were, "Appeared to."

20       Q.    And what did she and/or other people at

21  the Longmeadow Police do with the gas canister?

22       A.    They took the item back, both the

23  canister and the pamphlet, back to the police

24  department, tagged it and entered it into evidence.

25       Q.    Okay.  I want focus you on the large

1     middle paragraph that begins, "Upon arrival back at

2     the station," on page five.

3            A.     Okay.

4            Q.     What did Captain Fontaine and Police

5     Officer Pamela Chaplin do when they arrived back at

6     the station?

7            A.     They removed the partially burnt paper

8     material that was located in the spout of the yellow

9     can, and then they noted that after further review,

10    the paper content appeared to contain religious

11    material which appeared to have some bloodstains on

12    said paper.

13           Q.     And who did they contact next after they

14    observed the bloodstains on the paper?

15           A.     The Massachusetts crime lab in

16    Springfield and Sudbury.

17           Q.     What did the Longmeadow Police do with

18    respect to the paper, the canister and the liquid?

19           A.     They emptied the liquid from the yellow

20    can into another canister which was secured for

21    testing, and then Deputy Chief Macsata noted through

22    his training and experience he believed the liquid

23    to be gasoline, and then they took photographs and

24    entered into evidence the other items.

25           Q.     I want to focus you on page seven now of

1      the report.

2             A.     Okay.

3             Q.     Would you describe the photographs on

4      this page?  For reference, if you could, as you're

5      identifying the photographs, describe them as top

6      left, top right, middle left, middle right, bottom

7      left, bottom right.

8             A.     Yes.

9             Q.     How many photographs are on page seven?

10            A.     There are six photographs on this page.

11            Q.     Okay.  And if you could describe the

12     photographs with those identifiers and just briefly

13     describe what they depict.

14            A.     Yes.  The top left photograph is a

15     photograph of the entrance into Ruth's House, with

16     the location where the device was placed to the back

17     of the photographer, so this is kind of a shot away

18     from the gas canister.  You can see the crosswalk

19     there, and to the left is the entrance into Ruth's

20     House, and to the right where those police cars are

21     located, that's Converse Street.

22                   MR. WATKINS:  Your Honor, I wonder if

23     we can share these photographs.  I think that would

24     be helpful.

25                   THE COURT:  I agree.

1           MR. BRESLOW:  Absolutely.  One

2    moment, your Honor, and I will do that.

3           (Pause.)

4           MR. BRESLOW:  So can I confirm that

5    the Court and defense counsel and the witness can

6    see on the digital screen now what is identified as

7    page seven of the Longmeadow Police Department

8    report?

9           THE COURT:  We can see, Mr. Breslow.

10   We can see the top two photographs.  You'll have to

11   move the document up, but we can see the top two,

12   yes.

13          MR. BRESLOW:  Okay.  So what I'll do

14   with permission of the Court and the consent of

15   defense counsel is move down through the

16   photographs, scrolling down two by two, unless you

17   want to see the entire page, in which case I can

18   zoom out.

19          THE COURT:  I prefer to have you

20   scroll down.  Is that all right, Mr. Watkins?

21          MR. WATKINS:  Yes, that's fine.

22     Q.    So focusing on the top left, was that the

23   photograph you just described?

24     A.    Yes, it is.

25     Q.    And is that basically taken from the

1    perspective of where the device was located?

2         A.    Yes, it appears that the individual

3    taking the photograph was standing in the proximity

4    of where the device was located.

5              MR. BRESLOW:  So I'm now going to

6    focus on the top right photograph, and what I

7    believe I can do, your Honor, is I can reorient the

8    page so that the photograph which right now is kind

9    of laterally placed -- never mind.  Can your Honor

10   and Mr. Watkins view the photograph the way it is,

11   the original way which is positioned laterally?

12             THE COURT:  I can.

13             MR. WATKINS:  Yes, of course.

14        Q.    So if you could describe the second

15   photograph, the one that's in the top right

16   position.

17        A.    Yes.  This is a photograph of the device

18   itself, which is the yellow can there, and you can

19   see the nozzle sticking out.  You can see the tree

20   which it's placed next to, and the officer who took

21   the photograph was standing it appears on the

22   sidewalk along Converse Street.

23        Q.    And what's in the bottom right-hand

24   corner of that photograph is the sidewalk?

25        A.    Yes, that's correct.

1       Q.      Okay.  So it appears that the canister at

2    least in this photograph is located about three or

3    four feet from the actual sidewalk?

4       A.      Yes, it appears so.

5       Q.      I want to focus you on the middle

6    photographs.  Can you identify the photograph in the

7    middle right?

8       A.      The middle right, yes.  That is an image

9    of the device taken by the officer standing above

10   the device, and it shows you the yellow canister.

11   You can see the burnt paper protruding out of the

12   nozzle there.  It's a close-up, and you can see the

13   surrounding ground that it's placed on.

14      Q.      Okay.  I want to focus you now on the

15   bottom left photograph.  What does that depict?

16      A.      Again that is a photo of the device, the

17   yellow canister, the nozzle, and you can see the

18   paper protruding out of the nozzle.  Also you can

19   see behind in the background is the image of the

20   entrance to Ruth's House which we saw in the first

21   photo in the top left.  You can see the sign.  You

22   can see the street there.  You can see the two

23   police cars, and you can see the stop sign pole

24   which is directly to the left of the officer in the

25   background there.

1      Q.      And can you also see the crosswalk

2    leading from one end of the drive to the other,

3    continuing on to meet the sidewalk?

4      A.      Yes, you can.

5      Q.      Okay.  Can you identify the photograph in

6    the bottom right?

7      A.      Yes, the photograph in the bottom right

8    is an image.  It appears to be taken not at the

9    actual scene.  It looks to be taken perhaps at the

10   police department.  I'm not sure of that, but it's

11   an image of the pamphlet which was taken out of the

12   nozzle.

13     Q.      And the pamphlet has two pages that are

14   visible.  Does there also appear to be another

15   portion of the pamphlet which is partially charred

16   in the top left of the photograph?

17     A.      Yes, there is.  It looks like they took

18   the pamphlet apart and there's multiple parts of it.

19     Q.      Okay.  And can you just read the two

20   lines on the left page of the pamphlet?

21     A.      "Will you receive Jesus Christ right

22   now?"

23     Q.      I want to focus you on page eight of the

24   report and the top two photographs.  Can you

25   generally describe what these are?

1    A.    Yes.   These are additional images of the

2    religious pamphlet which were taken.   They appear,

3    looks to be the front and back side of potentially

4    the same image of the cut or tear-out on the bottom

5    of the pamphlet.

6    Q.    And the middle two photographs, what do

7    they depict?

8    A.    The middle photograph on the left is

9    again another image of the pamphlet spread out,

10   showing the rip in the middle.   Then the middle

11   right photograph is a portion of the paper pamphlet

12   which was in the crumpled state, and you can see the

13   burned, charred end on the bottom of.

14   Q.    And the bottom two photographs, can you

15   describe what they depict?

16   A.    Yes.   It looks like the same image that I

17   just described prior, which is what appears to be

18   spread out, showing the text and also showing kind

19   of how the paper had partially lit and burned part

20   of the way down.

21   Q.    I want to focus on the bottom right

22   photograph.   Can you read the words in red?

23   A.    "How can you pray."

24   Q.    Does it say, "How you can pray"?

25   A.    "How you can pray," yes.

1    Q.    Okay.  And what appears to be located at

2    the very end of that photograph?

3    A.    There appears to be a bloodstain.

4    Q.    I want to focus you now on page nine of

5    the report.  Can you identify the top two

6    photographs?

7    A.    Yes.  These are up close photographs of

8    the plastic canister taken from different angles.

9    Q.    And can you focus on the top left

10   photograph?  Does it appear to say, "Diesel fuel,

11   danger," in either print or stamped letters on the

12   side of the canister?

13   A.    Yes, it says, "Diesel fuel, danger."

14   Like you said, it looks like that perhaps was a

15   raised plastic there.  It looks like there might be

16   some additional writing below it.  It's hard to tell

17   from the photographs we're looking at.

18   Q.    Okay.  Can you identify the middle two

19   photographs on this page?

20   A.    Yeah, the middle left photograph again is

21   similar, just different angle than the top two, and

22   then the middle right photograph appears to be a

23   close-up of the handle.  Again it appears that there

24   is what appears to be a potential red bloodstain

25   there on the handle.

1      Q.    Lastly, the bottom photograph, which

2   there was only one photograph on the bottom.  It's

3   in the bottom left.

4      A.    Yeah, it is showing the front facing side

5   of the yellow container, and it looks like it has

6   the original label which the manufacturer would have

7   put on prior to this.

8      Q.    All right.  Now I want to focus you on

9   Government Exhibits 3, 4, 5 and 6.  Can you identify

10  each of those exhibits by their date and title, and

11  if you could just start with Government Exhibit 3?

12     A.    Yes.  Exhibit 3 is titled Commonwealth of

13  Massachusetts Department of State Police.  It's a

14  criminalistics report, and the report date is

15  April 4th, 2020.

16     Q.    And is that for the samples that were

17  provided by the Longmeadow Police Department to the

18  State Police Crime Lab?

19     A.    Yes, that is correct.

20     Q.    This report, which is in evidence, that

21  report is not discussed in the affidavit, correct?

22     A.    Yes.

23     Q.    I want to focus on Government Exhibit 4

24  and then 5.  What is Government Exhibit 4?

25     A.    The Commonwealth of Massachusetts

1    Department of State Police DNA Testing Report, and

2    the report date is April 6, 2020.

3         Q.    And that's the report that the complaint

4    affidavit discusses where two male DNA profiles were

5    obtained from the stains on both the pamphlet and

6    the diesel can?

7         A.    Yes.

8         Q.    Okay.  I want to turn your attention now

9    to Government Exhibit 5 very briefly.  What is

10   Government Exhibit 5?

11        A.    This is the Commonwealth of Massachusetts

12   Department of State Police report that's dated

13   April 9, 2020, and indicating that a search of CODIS

14   was performed.

15        Q.    And this was discussed in the complaint

16   affidavit as well, as you testified earlier?

17        A.    Yes.

18        Q.    And according to the report, both of the

19   stains were linked to the DNA profile that was in

20   CODIS for the defendant?

21        A.    That is correct.

22        Q.    Okay.  Then I want to focus your

23   attention now on Government Exhibit 6.  Is

24   Government Exhibit 6 discussed in the affidavit?

25        A.    No, it is not.

1          MR. BRESLOW:  I want to focus on

2    Government Exhibit 6 now.  Is this document

3    available on video to the Court, defense counsel and

4    the witness?

5          THE COURT:  Not at this moment.

6          MR. WATKINS:  You have to stop

7    sharing and then start it up again to put on a new

8    one.

9          MR. BRESLOW:  I see.  So I'm stopping

10   the sharing, and then I have to do a new share

11   basically every time?

12         MR. WATKINS:  That's correct.

13         MR. BRESLOW:  Thank you, Mr. Watkins,

14   very much for that.

15     Q.   I want to focus you on Government

16   Exhibit 6 now.  What is Government Exhibit 6?

17     A.   It is the Commonwealth of Massachusetts

18   Department of State Police DNA Report 2, dated

19   April 28, 2020.

20     Q.   And according to this report, does this

21   supersede the earlier DNA testing report which was

22   the CODIS match?

23     A.   That is correct.

24         MR. BRESLOW:  I just want to focus on

25   this report, and can I confirm that the Court and

1    Mr. Watkins and the witness can see this on the

2    screen now?

3              THE COURT:  Yes.

4              MR. WATKINS:  I can.

5              MR. BRESLOW:  You can or cannot,

6    Mr. Watkins?

7              MR. WATKINS:  Yes, I can see what we

8    can all see here.

9         Q.   So what does this report generally find?

10        A.    It finds that the sample taken from John

11   Michael Rathbun matches the DNA samples taken from

12   the pamphlet and the diesel gas can.

13        Q.   Okay.  And when you say the sample taken

14   from John Michael Rathbun, I want to focus you on

15   the last page, page two of this exhibit.  Who is the

16   forensic scientist who signed the report?

17        A.   Alanna L. Darby, Forensic Scientist II.

18        Q.   Did you have the opportunity to speak

19   with Alanna Darby very shortly before this hearing

20   began?

21        A.   I did.

22        Q.   Concerning this report?

23        A.   That's correct.

24        Q.   I want to focus now on page three.  What

25   did she say concerning the STR results table and the

1    column titled KSS John Michael Rathbun?

2         A.    She identified me that the KSS, known

3    saliva standard, was taken from the sample that the

4    FBI obtained from John Michael Rathbun on April 15th

5    during the search.

6         Q.    Okay.  So on the day of the search, in

7    addition to the activities that you generally

8    described and that are set forth in greater detail

9    in the complaint, did the FBI take a genetic sample,

10   a DNA sample from the defendant pursuant to both the

11   search warrant that was authorized by Magistrate

12   Judge Robertson as well as the FBI's ordinary arrest

13   booking protocols?

14        A.    Yes.

15        Q.    And this known saliva sample or KSS, that

16   is what's referenced in this report?

17        A.    That is correct.

18        Q.    Okay.  So according to the report,

19   focusing you on page one, what did the state crime

20   lab or in particular Ms. Darby determine concerning

21   the known saliva sample when it was compared to the

22   samples from both the pamphlet and the diesel can?

23        A.    That John Michael Rathbun matched the DNA

24   profile of the samples taken from the gas can and

25   the pamphlet.

1      Q.    And according to the report, what was the

2  expected frequency of this profile occurring in any

3  other individual?

4      A.    One in 568.2 octillion.

5      Q.    And what is an octillion?

6      A.    It's a one followed by 27 zeros.

7      Q.    Okay.  So in plain terms, does that mean

8  that Mr. Rathbun's DNA sample taken by the FBI on

9  April 15th matched the DNA on both the pamphlet and

10  the diesel can, and the odds of anybody else, any

11  other individual person having that same DNA profile

12  is one in 568 octillion?

13      A.    Yes, that is correct.

14            MR. BRESLOW:  I want to focus you now

15  on Government Exhibit 7.  Can the Court and defense

16  counsel and the witness see Government Exhibit 7 on

17  the screen?

18            THE COURT:  Yes.

19      Q.    What is Government Exhibit 7, Special

20  Agent Boucher?

21      A.    It's an affidavit from Daniel Marshall,

22  who is an executive at Scepter Manufacturing.

23      Q.    And according to the affidavit -- is it

24  notarized, by the way, and sworn to by the penalties

25  of perjury on April 28, 2020?

1          A.     Yes, it is.

2          Q.     According to Mr. Marshall, where does

3     Scepter manufacture its rugged plastic fuel

4     containers?

5          A.     Two facilities, one in Miami, Oklahoma,

6     and the other in Scarborough, Ontario, Canada.

7          Q.     Does Scepter currently manufacture any

8     canisters in Massachusetts?

9          A.     It does not and never has done so.

10         Q.     I want to focus you now on Government

11    Exhibit -- well, I want to pause for a moment.

12    Before I show you the next exhibit, today did you

13    review the website of the United States Emergency

14    Information Administration, otherwise know as EIA?

15         A.     Yes, I did.

16         Q.     And does the EIA website contain

17    state-by-state emergency profiles, including for the

18    Commonwealth of Massachusetts?

19         A.     It does.

20         Q.     Now, according to the EIA website, as of

21    July 18th, 2019, does Massachusetts have any crude

22    oil production or reserves or refineries?

23         A.     It does not.

24         Q.     And according to the same website, are

25    refined products such as gasoline or diesel

1    primarily transported into Massachusetts through

2    Boston Harbor from places such as Europe, Canada and

3    elsewhere in the United States?

4         A.    Yes, it is.

5         Q.    So if there were in fact gasoline or

6    diesel in that container that was located on

7    April 2nd, it would necessarily have had to have

8    come from outside of the Commonwealth of

9    Massachusetts?

10        A.    Yes.

11        Q.    Through some other refinery?

12        A.    Yes.

13        Q.    Okay.  I want to ask you now what entity

14   owns and operates Ruth's House?

15        A.    JGS, which stands for Jewish Geriatric

16   Services.

17        Q.    Now, have you reviewed the JGS website?

18        A.    Yes, I have.

19        Q.    And did you review it in just the past

20   several days?

21        A.    Yes.

22        Q.    Does it describe the various facilities

23   on the JGS campus in Longmeadow?

24        A.    Yes, it does.

25        Q.    I want to focus you now on Government

1    Exhibit 8.

2         A.    That number --

3         Q.    I'm sorry, Government Exhibit 9.  I'm

4    sharing now to you, the Court and defense counsel

5    Government Exhibit 9.  Can I confirm that that's

6    available to everybody?

7                   THE COURT:  Yes.

8                   MR. WATKINS:  I see it.

9         Q.    What is Government Exhibit 9?

10        A.    It is a map zoomed in on a part of

11   Longmeadow, Massachusetts, which shows the JGS

12   campus and Converse Street kind of cutting through

13   the center of the map.

14        Q.    And is the JGS campus, at least as

15   depicted here, on the right side of Converse Street

16   starting approximately at Althea Drive and running

17   down along Converse Street on the right side towards

18   the bottom right of the map?

19        A.    Yes, that is correct.

20        Q.    Okay.  I want to focus now with reference

21   to this map, can you identify the approximate

22   location where the Longmeadow Police Department

23   found the incendiary device on April 2, 2020?

24        A.    So you can see a small gray pin at the

25   intersection of Converse and the entrance to Ruth's

1    House.  Yes, right there.  So approximately where

2    that pin was placed is where the device was located.

3        Q.    Okay.  So the crosswalk that was depicted

4    is what's crossing parallel to Converse Street on

5    the road that's labeled Ruth's House on your map?

6        A.    Yes, that is right.

7        Q.    All right.  Now, can you identify where

8    Ruth's House is for the Court?

9        A.    Yes.  So if you follow that Ruth's House

10   Road which is identified, follow that up to the top

11   right-hand side of the map where you just

12   highlighted, that is where the Ruth's House Assisted

13   Living facility is located.

14       Q.    And that building is actually identified

15   with a pin as Ruth's House Assisted Living?

16       A.    Yes, that's correct.

17       Q.    And generally speaking what function does

18   Ruth's House provide?  What commercial service does

19   it provide?

20       A.    Ruth's House provides a service for

21   elderly individuals that gives them assisted living,

22   so they need some care, and they have apartments

23   there.

24       Q.    Now, with reference to the same map, can

25   you identify for the Court some of the other primary

1    buildings belongings to JGS on its campus?

2         A.    Yes.

3         Q.    Let's start with the building that's

4    pinned as JGS Lifecare, this very large building.

5         A.    Yes.

6         Q.    What is that?

7         A.    So that is the nursing home facility that

8    JGS owns in Longmeadow.  It's also known as Leavitt

9    House.  They have patients from the surrounding area

10   who need more intensive care than Ruth's House

11   provides.  It's a nursing home.

12        Q.    And do they generally employ personnel

13   and accept patients from, as you say, the

14   surrounding area including Connecticut?

15        A.    Yes, that's correct.

16        Q.    How far is Connecticut from this area of

17   Longmeadow approximately?

18        A.    Longmeadow is very close to the

19   Connecticut border.  I would say less than two

20   miles.

21        Q.    Okay.  Now, in addition there's a pin

22   next to the phrase Genesis House.  Can you describe

23   where Genesis House is actually located on this map?

24        A.    Yes.  So that pin was placed there by

25   Google Maps themselves.  I didn't place that pin

1    there.  So the buildings that you can see the

2    outline of within the box you just drew is where the

3    actual Genesis outbuildings are located.

4         Q.    Okay.  Because the box that I just drew

5    on the exhibit won't go the court for the record,

6    are the three buildings at least of Genesis House

7    located within a u-shaped circular drive that's

8    bounded by Converse Street on the left, just above

9    the pin that says Genesis House?

10        A.    Yes, the three buildings directly above

11   the pin which says Genesis House are part of the

12   Genesis House complex.

13        Q.    Okay.  And can you explain to the Court

14   what Genesis House is, what services it provides and

15   how it functions generally?

16        A.    Yes.  So Genesis House is low income

17   housing for seniors that are independent.  So it's

18   small efficiencies and apartments for seniors who

19   have their own apartments in an elderly complex.

20        Q.    And do those seniors rent the apartments?

21        A.    They do.  They rent the apartments from

22   JGS.

23        Q.    And are those apartments subsidized in

24   part in any way?

25        A.    Yes, it's subsidized in part by HUD.

```
 1          Q.    And what is HUD?
 2          A.    Housing and Urban Development.
 3                MR. BRESLOW:  Your Honor.
 4                THE COURT:  Yes.
 5                MR. BRESLOW:  I've received a
 6    notification that a telephone number starting with
 7    617 has entered the waiting room for the meeting,
 8    and my computer at least has two buttons, admit and
 9    see the waiting room.  Does your courtroom deputy
10    have that or does the Court have that?
11                THE CLERK:  I have it.
12                THE COURT:  I believe Ms. Rivera
13    does.
14                MR. BRESLOW:  So I'm not going to do
15    anything with respect to this button.
16          Q.    Forgive me for interrupting, Special
17    Agent Boucher.  Just with respect to all of the
18    grounds, meaning the actual physical land that
19    surrounds this property, on the right side of
20    Converse Street on what you're describing as the JGS
21    campus, does JGS maintain these grounds?
22          A.    Yes, they do.
23          Q.    Meaning the lawns and trees and all that
24    material?
25          A.    Yes, they maintain the grounds for the
```

1    use of the residents, whether walking or just

2    spending time outdoors.

3        Q.    Okay.  And referring briefly to your

4    testimony concerning the Longmeadow Police

5    Department report, that's what Ms. Ilina said she

6    generally does as part of her daily activities?

7        A.    Yes, a part of her morning routine, she

8    walks along the JGS campus and sidewalks.

9            MR. BRESLOW:  I want to focus you

10    now on the final exhibit.  So I'm going to stop

11    sharing this one, and I'm going to share Government

12    Exhibit 10 with the Court, Mr. Watkins and you.  Can

13    everyone confirm that they are now seeing Government

14    Exhibit 10 on their screen?

15            THE COURT:  Yes.

16            MR. WATKINS:  Yes, it's there.

17        Q.    What is Government Exhibit 10, which is

18    already in evidence, Special Agent Boucher?

19        A.    Yes, this is a screen shot taken from

20    Google Maps Street View which shows the entrance to

21    Ruth's House, and also Converse Street which you can

22    see in the middle left-hand.  The middle left of the

23    image, that road there, that's Converse.

24        You can also see the area where the device

25    was placed.  So if you kind of focus in on the tree

1    which is kind of angled to the left there, about

2    maybe five, six feet away from the stop sign, the

3    back side of the stop sign, that is where the device

4    was placed.

5        Q.    Okay.  I want focus you now on the sign

6    on the bottom right of the image.  I'm going to zoom

7    in on this so that it's more visible to you and the

8    Court and Mr. Watkins.  Can you read for the Court

9    the sign that is on the bottom right of the image?

10        A.    Yes.  It reads Jewish Geriatric Services,

11    Inc., and then below that it says JGS Family Medical

12    Care.  Below that it says Ruth's House, and then

13    below that it says Wernick Adult Daycare, and it has

14    an arrow pointing up the street to the entrance of

15    Ruth's House.

16        MR. BRESLOW:  Your Honor, I just have

17    one or two last questions for Special Agent Boucher.

18        THE COURT:  Thank you.

19        Q.    Special Agent Boucher, you indicated you

20    had approximately 13 years of experience with the

21    FBI, is that right?

22        A.    That's correct.

23        Q.    Approximately how many years of

24    experience have you had with the JTTF in particular?

25        A.    I'd say approximately eleven.

1     Q.    Okay.  With respect to both your ordinary

2    training and experience at the FBI and in particular

3    your experience with the JTTF, have you acquired a

4    basic knowledge of how incendiary devices, including

5    Molotov cocktails and explosives, function?

6     A.    Yes, I have.

7     Q.    And does that include a basic knowledge

8    of how a device like the one you've been testifying

9    about would function?

10     A.    Yes.

11     Q.    Assuming it contained gasoline?

12     A.    Yes.

13     Q.    Based on your training and experience,

14    what could have happened if the device had in fact

15    contained gasoline and ignited instead of apparently

16    sputtering out from that fuse?

17     A.    It could have potentially exploded, which

18    could have harmed individuals and property nearby.

19           MR. BRESLOW:  I have no further

20    questions.

21           THE COURT:  Mr. Watkins.

22         CROSS-EXAMINATION BY MR. WATKINS

23     Q.    Good afternoon, Agent Boucher.  You've

24    been with the FBI for how many years?

25     A.    About 13 and a half since 2006.

1      Q.    And part of becoming an FBI agent is

2    doing training at Quantico?

3      A.    That is correct.

4      Q.    And you learned about all kinds of stuff?

5    It's basic training for FBI agents, correct?

6      A.    Yes.

7      Q.    And in connection with the Joint

8    Terrorism Task Force, you undergo additional

9    training, right?

10      A.    Yes, I've taken different trainings.

11      Q.    This training can focus on all kinds of

12    organized groups that might be up to crime, right?

13      A.    Yes.

14      Q.    That would include white supremacist

15    groups?

16      A.    Yes.

17      Q.    Have you investigated cases involving

18    white supremacist groups?

19      A.    Yes, I have.

20      Q.    And as Mr. Breslow pointed out, you have

21    specific training in this violation, 844?

22      A.    Can you repeat the question?

23      Q.    You have specific training in this

24    violation, 18 U.S. Code 844, explosives?

25      A.    No, I would not say I'm an expert on

 1    explosives.

 2         Q.    I didn't say expert, but you've had

 3    training.  I think that's what you just told

 4    Mr. Breslow, right?

 5         A.    Yes, I've had some training that included

 6    some information about explosives.

 7         Q.    Correct.  And that was the basis for your

 8    opinion that this could have hurt somebody or

 9    property that you just gave, right?

10         A.    Yes.

11         Q.    That's because of the training that you

12    had in this violation about explosives, correct?

13         A.    Yes.

14         Q.    Okay.  You talked at the beginning of

15    your testimony about some of the things that you

16    looked at; the complaint, the search warrant

17    affidavit, the Longmeadow Police report, and

18    pictures that we've seen.  You've looked at all of

19    those?

20         A.    Yes.

21         Q.    And when you looked at those, you've also

22    compared them with your own observations since you

23    became involved in the case, correct?

24         A.    Can you expound on what do you mean by

25    other observations?

1      Q.    Sure.  For example, you read in the

2   complaint about the placement of the gas can, and

3   you went online to confirm and to figure out where

4   that was.  That would be an example, correct?

5      A.    Yes, that's correct.

6      Q.    And you've read over both the complaint

7   and the search warrant, and spoken with Agent

8   McGonigle about both of those, is that correct?

9      A.    Yes, I've discussed both of those with

10   Agent McGonigle.

11      Q.    So for example, if you had any questions

12   about something that was said in either one of those

13   documents, you would have tried to clear it up with

14   him so that you understand before testifying today,

15   correct?

16      A.    Yes.

17      Q.    And I think you mentioned in response to

18   Mr. Breslow's questions that you'd had some meetings

19   before your testimony here.  Could you elaborate on

20   who you met with in preparation for your testimony

21   today?

22      A.    Yes.  Special Agent McGonigle, AUSA Steve

23   Breslow, and trial attorney Risa Berkower.

24      Q.    They went over your testimony.  If there

25   were questions about what was in the complaint

1      affidavit or search warrant affidavit, you would

2      bring that up and you would straighten that out with

3      them, correct?

4              A.    Yes, I had the opportunity to ask

5      questions.

6              Q.    Right.  I want to turn now first to the

7      complaint, which is Exhibit 2 in front of you.

8              A.    I thought you said Exhibit 1 was the

9      criminal complaint.

10             Q.    You're quite right, Exhibit 1.

11     Specifically I want to turn to paragraph four of

12     that exhibit.  Are you seeing that in front you

13     right now?

14             A.    Yes, I do see it.

15             Q.    Okay.  I want to direct you to the second

16     sentence here which reads, "The affidavit includes

17     only those facts I believe are necessary to

18     establish probable cause for the requested criminal

19     complaint," correct?

20             A.    Yes.

21             Q.    It goes on to say, "It does not include

22     all the facts uncovered during the investigation,"

23     right?

24             A.    Yes.

25             Q.    Okay.  You've been the affiant in many a

1      application for criminal complaint as well, right?

2           A.    Yes.

3           Q.    And that is something that you would put

4      in your applications, your affidavits in support of

5      a criminal complaint, correct?

6           A.    Yes, I believe I've seen that language

7      before.

8           Q.    It's pretty ubiquitous, right?

9           A.    Yes.

10          Q.    But it does mean what it says and says

11     what it means, that you're trying to include facts

12     believed to be necessary to establish probable cause

13     for the violations, right, for the criminal

14     violations?

15          A.    Yes.

16          Q.    That complaint, Exhibit 1, goes on at

17     some length about white supremacist organizations or

18     a white supremacist organization, correct?

19          A.    It does.

20          Q.    Again, this was according to Agent

21     McGonigle necessary to establish probable cause for

22     the magistrate to issue an arrest warrant, correct?

23          A.    I don't -- I'm not sure of all the exact

24     reasons that Ryan included this.  You know, I didn't

25     ask him specifically how each paragraph or each

1   section was chosen to be included.  That wasn't part

2   of the discussions we had.

3       Q.   But again, going back to what he said

4   under oath in this affidavit, he's including only

5   those facts he believes are necessary to establish

6   probable cause, right?

7       A.   Yes, it does say that.

8       Q.   And of course you don't want to tell more

9   about your case than you need to to get probable

10  cause, right?

11              MR. BRESLOW:  Objection, your Honor.

12              THE COURT:  The basis?

13              MR. BRESLOW:  This is not the special

14  agent's affidavit.  I think he's calling for

15  speculation at this point.

16              THE COURT:  I'm going to overrule the

17  objection.

18      Q.   So you understand he's saying that the

19  facts in there are to establish probable cause,

20  correct?

21      A.   Yes.

22      Q.   So turning to paragraph nine through 17

23  in that affidavit, it goes on at some length about

24  the white supremacist organization, correct?

25      A.   Yes, it does.

1          Q.     And the violation at issue that you've

2     looked at, violation of 844(d) and violation of

3     844(i), both of those require an intent to destroy

4     or intent to injure, correct?

5          A.     Could you specifically highlight the

6     section you're reading on that?

7          Q.     Sure.   18 USC 844(d) says for a violation

8     a person has to have, "Knowledge and intent that it

9     will be used to kill, injure or intimidate any

10     individual or unlawfully damage or destroy any

11     building, vehicle or other personal property."   Do

12     you see that in the violation?

13          A.     Do you mind pointing out the paragraph

14     that was from?

15          Q.     That's actually from the statute at

16     844(d).   I do believe it's also in the complaint

17     at --

18                     MR. BRESLOW:   Paragraph five, your

19     Honor.

20          Q.     Paragraph five in the criminal complaint.

21          A.     Yes, I do see that now.

22          Q.     Okay.   So one thing that is required for

23     probable cause is some kind of evidence of a

24     person's intent, why they would do something like

25     this, is that fair to say?

1          MR. BRESLOW:  Objection, your Honor.

2    The objection is the question appears to be asking

3    the special agent to talk about the elements of the

4    offense, which is a legal question.  The complaint

5    speaks for itself.

6          THE COURT:  Right.  I think I will

7    sustain that objection, Mr. Watkins.

8          Q.    You just testified a moment ago that you

9    have familiarity with white supremacist

10   organizations generally?

11         A.    That is correct.

12         Q.    And you understand that people involved

13   in white supremacist organizations regularly use

14   hate speech in everyday conversations?

15         A.    I think that would be very common for

16   many of those individuals to use that language.

17         Q.    Racial slurs, same thing, they don't mind

18   saying them and they'll say them loudly, correct?

19         A.    Yes.

20         Q.    They're quite open in their dislike of

21   others due to race, religion and nationality, would

22   you agree with that?

23         A.    I think many of them are open about it,

24   perhaps not all of them though depending on their

25   life situation.

1          Q.    They are likely to express resentment of

2     other races and creeds to others, is that a true

3     statement?

4                    MR. BRESLOW:  Your Honor, before the

5     special agent answers, I'm going to object again.

6     Before objecting I've allowed a number of questions

7     along this line.  It's beyond the scope really of

8     the direct.  We have not questioned Special Agent

9     Boucher at all concerning paragraphs five through

10    17.  We haven't discussed white supremacy or

11    anything like that.

12                    I think this is all just far beyond the

13    scope of direct, far beyond the purpose of a

14    preliminary hearing, and is venturing into really

15    territory that shouldn't be inquired into of this

16    agent at this hearing.

17                    THE COURT:  So I think, Mr. Watkins,

18    I will overrule this objection, but I'm going to

19    limit further questions in this area.  I think I get

20    the point, so to speak.

21                    MR. WATKINS:  Judge, this is

22    introductory, but I would note the government has

23    put in the complaint as evidence.

24                    THE COURT:  Yes.

25                    MR. WATKINS:  The complaint does

 1    discuss it.  The fact that they declined to question

 2    their witness on the stand has no relevance to

 3    whether this is the subject of cross-examination.

 4    Unless the government is disclaiming any reliance on

 5    Mr. Rathbun's alleged ties to white supremacy.

 6                    THE COURT:  So I think I would say

 7    two things.  It doesn't appear to be an element of

 8    the offense, of the two offenses with which

 9    Mr. Rathbun is charged, sort of religious animus at

10    this point.  Again, I agree with you that the

11    affidavit is in evidence.  I understand the point.

12    I'm overruling the objection, but I think we're sort

13    of at the end of what I need to hear on that point.

14                    MR. WATKINS:  I have one more

15    background question and then I'll move on --

16                    THE COURT:  Thank you.

17                    MR. WATKINS:  -- to other issues

18    related to it.

19         Q.    Agent Boucher, you have read the

20    affidavit in support for the search warrant of

21    Mr. Rathbun's home, car and person, correct?

22         A.    Yes, I've read that.

23         Q.    That is also authored by Agent McGonigle?

24         A.    Yes, that's correct.

25         Q.    As to white supremacists and people who

1    are doing acts in support of white supremacy, he

2    writes, "Users who take action such as planting an

3    incendiary device would likely disclose that

4    activity to other users so their status would be

5    elevated within that of the community."  Is that a

6    fair statement given your training and experience in

7    white supremacist groups?

8               MR. BRESLOW:  Same objection, your

9    Honor.

10              THE COURT:  I'm going to overrule the

11   objection, but again, this is the last question in

12   this area.

13              MR. BRESLOW:  Your Honor, if

14   Mr. Watkins could direct the agent to the particular

15   paragraph that he's inquiring about just so that the

16   agent could respond accurately.

17              MR. WATKINS:  Of course.  That's

18   paragraph 105.

19              MR. BRESLOW:  On page 47.

20        A.   Yes, I have that in front of me.  Can you

21   repeat the question, please?  I'm sorry.

22        Q.   Sure.  Agent McGonigle writes, "Based on

23   my training and experience, and the experience of

24   others involved in this investigation, I know that

25   users who take action such as planting an incendiary

 1    device would likely disclose that activity to other

 2    users so that their status would be elevated within

 3    that online community."  Is that an accurate

 4    statement in light of your training and experience?

 5          A.    I see that Agent McGonigle wrote that.

 6    My experience has been that it depends on the

 7    specific individual.  Some people would want to gain

 8    status in the community, but some individuals might

 9    have the specific situation in their life where they

10    would chose not to do so.  I think it depends on the

11    person.

12          Q.    Sure.  He's not saying everybody.  He

13    said, "Would likely disclose that."  That's what he

14    writes in paragraph 105, is that correct?

15          A.    He does say that, yes.

16          Q.    And is that true?  Do you agree with that

17    statement given your own training and experience?

18          A.    I think many individuals in these white

19    supremacy organizations do, are part of a community

20    that they desire the gratification of having other

21    individuals know that they've done these acts or are

22    discussing these acts, but many individuals in these

23    groups hide their identity and don't want people to

24    know who they are when they're discussing these

25    things.

1      Q.     So on this point you are disagreeing with

2    Agent McGonigle then?

3                    MR. BRESLOW:  Same objection, your

4    Honor.

5                    THE COURT:  I'm going to sustain the

6    objection.  This is becoming argumentative at this

7    point.

8      Q.     The affidavit goes on to describe two

9    platforms, and this is the search warrant affidavit,

10   correct?  You understand that?

11     A.     Yes.

12     Q.     The point I'm talking about?

13     A.     Yes, I do now.

14     Q.     And it talks about each platform

15   individually, and it also notes that as to the first

16   platform, platform one, it has identified users and

17   IP addresses of that platform.  Do you see that in

18   the affidavit?

19     A.     Do you mind pointing me to a specific

20   paragraph number again?  I generally know what

21   you're discussing, but if you're talking about

22   specific language, I'd like to see the paragraph.

23     Q.     One moment.

24                    (Pause.)

25                    MR. BRESLOW:  Mr. Watkins, maybe

1   paragraph 63 on page 35.

2          Q.    Mr. Breslow is quite correct.  Do you see

3   paragraph 63?

4          A.    I do.

5          Q.    And then continuing on in 64, it begins

6   to talk about -- this is actually for platform two,

7   but we can go ahead and talk about that anyway.

8   Platform two, all of the users -- as a result of

9   this investigation, you turned up the IP addresses

10  of all of the users of that platform, correct?

11         A.    I do see these.  Yes, I see the IP

12  addresses and the users listed here, yes.

13         Q.    Let me stop a little bit about IP

14  addresses.  IP addresses, you're familiar with your

15  training and experience and investigation, correct?

16         A.    Yes.

17         Q.    IP addresses are addresses, but they're

18  also the route of how to get to the address, is that

19  true?

20         A.    Yes, they're a tool that we utilize to

21  sometimes identify the individual.

22         Q.    Right.  So they also have within them

23  information that will narrow down the search to

24  particular regions or particular places, even though

25  you do not know what the name of the person is,

1    right?

2         A.    Yes.

3         Q.    To your knowledge, given your

4    investigation of this case, any of those 27 people

5    identified for whom IP addresses were provided, has

6    any of them turned out to be in or around

7    Longmeadow, Massachusetts?

8         A.    I have not been involved in that aspect

9    of the investigation, so I'm unable to answer that

10   question.  I haven't been included in that part of

11   the investigation.

12        Q.    Right.  And indeed there's more

13   information as to all of those users on that

14   particular platform, platform two, which allows

15   agents to identify who they are, right?

16        A.    You know, looking at the information

17   which you just highlighted, there are IP addresses

18   and email addresses listed on some of them, yes.

19   Those are tools that the FBI will utilize and can

20   utilize generally to try to identify individuals.

21        Q.    So in your conversations with Agent

22   McGonigle then, there's been no indication that any

23   of those people are John Rathbun, is that correct?

24        A.    I haven't had discussions with Agent

25   McGonigle about these individuals and their

1    potential identities.

2         Q.    But as a trained investigator, you know

3    that you could find out the identities given the

4    amount of information that's in the search warrant

5    affidavit, correct?

6         A.    It is possible that the FBI will be able

7    to take this information and identify those

8    individuals behind them.

9         Q.    In particular this is reflected in the

10   search warrant affidavit at paragraph 24.  It talks

11   about one of the users of platform one talking about

12   two possible choices for a target.  Do you see that?

13        A.    Yes, I do see it.

14        Q.    And that information is repeated in the

15   application for criminal complaint that was filed

16   before Judge Robertson, correct?

17        A.    Yes, it was.

18        Q.    And that person has been identified, is

19   that correct?  Law enforcement knows who that is at

20   this point?

21        A.    Yes, I believe later on in this document

22   the individual was identified.

23        Q.    And arrested, correct?

24        A.    I'm unaware that he was arrested.  You'd

25   have to point me to a specific paragraph.  I don't

1    recall that.

2         Q.    But regardless, we know who he is, and

3    are you aware of any connection of that person with

4    John Rathbun of Longmeadow, Massachusetts?

5         A.    Again, I have not been party to

6    discussions about this individual's connections

7    potentially to the defendant.  I just haven't been

8    part of that investigation, so I can't really answer

9    your question.  I'm sorry.

10        Q.    And when preparing for this hearing with

11   Mr. Breslow and Agent McGonigle, nobody talked about

12   any other evidence of white supremacist connections

13   with Mr. Rathbun, is that correct?

14        A.    No, I'm not aware of any of that sort of

15   information.

16        Q.    As Mr. Breslow indicated, he hasn't

17   questioned you at all about what is in the actual

18   application for complaint, correct?

19        A.    Yes, that's correct, but I don't know

20   what information the other agents and prosecutors

21   have.  I haven't been included on all of the

22   discussions, so there is potentially information

23   that I'm unaware of on this case.

24        Q.    Sure.  But you're the agent here

25   testifying as to probable cause to continue this

1    case, that's true?

2        A.    Absolutely.

3        Q.    A few more questions about platform two.

4    Concerning how one becomes a member of the

5    organization listed on platform two, in order to do

6    that, one has to download specific software, has to

7    sign in to the platform, and then must be invited to

8    join, is that true?

9            MR. BRESLOW:   Objection, your Honor.

10   This is at this point far beyond the scope of

11   direct, far beyond the scope of the preliminary

12   hearing.

13           MR. WATKINS:   Judge, I just have a

14   few more questions.

15           THE COURT:   Yeah, two or three more

16   questions, Mr. Watkins.  Again, I understand the

17   point.  The contents of the affidavit in support of

18   the criminal complaint are there, Mr. Breslow, and I

19   think Mr. Watkins is entitled to point to those and

20   ask questions about them.

21           MR. BRESLOW:   I agree, your Honor,

22   but if I understand his question correctly, he is

23   asking about investigative techniques that the FBI

24   may have conducted as to accessing platform two.

25           THE COURT:   I think the focus of his

1    question is -- well, I'll let Mr. Watkins explain.

2         Q.    So to become part of this discussion

3    about a Jew nursery home in Longmeadow, one would

4    have had to download the software, sign on to the

5    platform, and been invited to the particular team

6    that was discussing that, is that true?

7         A.    Do you mind pointing me to the particular

8    paragraph that you're referring to in this?

9         Q.    Paragraph 96 of the search warrant

10   affidavit.

11        A.    Yes, I see that.  Yes.

12        Q.    The 27 people that are listed just before

13   that paragraph, all of them downloaded the software,

14   signed on to the platform, and had been invited to

15   this conversation concerning Jew nursery homes,

16   correct?

17        A.    Yes.

18        Q.    And then to get to -- there's mention in

19   the criminal complaint about a calendar, Jew hating

20   day on April 3rd.  That was listed within platform

21   two, correct?

22        A.    Yes, that was part of the platform two,

23   the specific organization.

24        Q.    So all of those things are still true?

25   In order to see that calendar entry, you would have

1     had to download software, sign on to the platform,

2     invited to join the team, and then gone into the

3     calendar in order to see that particular entry, is

4     that true?

5                    MR. BRESLOW:  Objection, your Honor.

6     I don't believe there's any foundation for beyond

7     what the search warrant affidavit states, that this

8     witness has any understanding of how platform two

9     actually operates, and the affidavit speaks for

10    itself.

11                   THE COURT:  It's not in evidence in

12    this proceeding.  You've chosen not to introduce it

13    into evidence, Mr. Watkins.  I think I am going to

14    cut this off at this point.

15                   MR. WATKINS:  Your Honor, I would

16    move it into evidence then if that is the objection.

17                   THE COURT:  If that's the basis.  I

18    believe it's under seal at this point.  Portions of

19    it are under seal.

20                   MR. BRESLOW:  Your Honor, we provided

21    a redacted form of the exhibit which is under seal

22    to the defense for discovery purposes.  I don't have

23    any objection to its provision to the Court in

24    evidence under seal for purposes of the inquiry, but

25    I do want to renew my objections that this is so far

1    beyond the scope of direct and the purpose of the

2    hearing.

3              If Mr. Watkins could explain how this line

4    of questioning would undermine the finding of

5    probable cause, then perhaps we would have a better

6    sense as to why this line of questioning should be

7    continued.

8              THE COURT:  It's intent, Mr. Breslow.

9    He's focused on intent to harm, intent to injure.  I

10   believe that's what he's focused on.  Mr. Watkins.

11             MR. WATKINS:  You're exactly correct,

12   your Honor.  Again, the government, as this agent

13   has testified, as Agent McGonigle testifies in his

14   affidavit, the issue of white supremacist ties was a

15   part of the probable cause showing before this Court

16   for the arrest warrant.  Unless the government is

17   now disavowing that, then I need to continue to show

18   why that should not be relied on for probable cause.

19             MR. BRESLOW:  No, we're not

20   disavowing any of it.  I just don't understand how

21   the introduction of this evidence or pursuit of this

22   line of questioning somehow undermines the intent to

23   harm, injure or intimidate as set forth in the

24   statute.

25             THE COURT:  Well, that is

1    Mr. Watkins' argument, Mr. Breslow.

2                    MR. BRESLOW:  For the record, we

3    object.

4                    THE COURT:  Again, I understand where

5    this is going, Mr. Watkins.  I don't think we need

6    to spend much more time on it.

7                    MR. WATKINS:  May I ask one more

8    question about the calendar entry that is listed in

9    there?

10                   THE COURT:  One more.

11       Q.    In the criminal complaint, Agent Boucher,

12   it talks about this particular calendar entry, about

13   a Jew nursery home, correct?

14       A.    I believe there was a misspelling.

15       Q.    Right.

16       A.    But yes, I recall what you're describing.

17       Q.    And on that particular platform, eleven

18   users were invited to that particular event, six

19   users accepted, six of them are identified, and law

20   enforcement now knows who they are, is that true?

21       A.    Again, I am unaware of that aspect of the

22   investigation.  I'm not sure what the FBI or other

23   law enforcement agencies have done to identify those

24   individuals.

25       Q.    I want to move on now to the execution of

1    a search warrant at Mr. Rathbun's house.  In

2    preparation for that, to go back to the search

3    warrant affidavit for just a moment, Agent McGonigle

4    wrote there, this is paragraph 123, "White

5    supremacists frequently print material relating to

6    their ideology and interest, including how to plan

7    and conduct violent attacks," right?

8         A.    Yes, I see that.

9         Q.    And is that consistent with your own

10   experience and training?

11        A.    Yes, absolutely.

12        Q.    So one might expect to find at a white

13   supremacist's house hard copies of white supremacist

14   matter, is that fair to say?

15        A.    It's very possible.

16        Q.    In fact, as Agent McGonigle points out,

17   "White separatists frequently maintain this material

18   for many years."  Is that also true in your

19   experience?

20        A.    I don't believe I've ever asked any

21   specific white supremacist I've had the opportunity

22   to interview how long they've kept that material

23   for.  I think with the advent of hard drives and

24   things like that, you know, you can keep many

25   documents for a lot longer.  I think it's possible

1   that you create something, it could last for a long

2   time.

3       Q.    And he writes specifically in the

4   application for a search warrant, "Hard copies

5   frequently being maintained for several years in

6   addition to digital evidence."  That's true?

7       A.    That is possible that an individual could

8   keep hard copies of these materials that they're

9   distributing.

10       Q.    Agent McGonigle, as I understand it, the

11   search warrant, in addition to authorizing search of

12   Mr. Rathbun's premises, himself and his truck, was

13   also to get certain records from platforms one and

14   two as well?

15       A.    Yes, that is correct.

16       Q.    And Agent McGonigle writes that the

17   search warrant was designed to answer the question

18   of whether Rathbun associated with those two

19   platforms, right?

20       A.    Could you point me to that specific

21   paragraph?  What you're saying seems familiar, but

22   before I agree, I'd like to see that in writing.

23              MR. BRESLOW:  Your Honor,

24   Mr. Watkins, I think you're referring to page 46,

25   footnote ten.

1          MR. WATKINS:  No.  Let's see.

2          THE COURT:  No?

3          MR. WATKINS:  I don't believe so.

4    Footnote ten?

5          THE COURT:  On page 46.

6          MR. WATKINS:  I do understand that.

7    I'm talking more generally.

8          Q.   What you did expect or what Agent

9    McGonigle expected was to find information about

10   whether Mr. Rathbun associated with white

11   supremacist groups and particularly these two

12   platforms, correct?

13         A.   Yes, that was one of the goals of the

14   search warrant.

15         Q.   And you're familiar with what was

16   actually found at the search site?

17         A.   No, I'm unable to answer that question.

18   I was not present.  I didn't go in the house and I

19   haven't been briefed on the findings.

20         Q.   So you didn't review any of the pictures

21   that were taken there, review an inventory of what

22   was taken out of the house, none of that?

23         A.   No.  The only photographs I've reviewed

24   are the ones that the AUSA Breslow asked me to

25   testify about.

1    Q.    So in your discussions with Attorney

2    Breslow and with Agent McGonigle, had they told you

3    about anything that was found at that house?

4    A.    No.

5              MR. BRESLOW:  Your Honor, I'd object

6    only as to the aspect of the question that relates

7    to any interaction between the attorney and the

8    witness.

9              MR. WATKINS:  I'll rephrase it.

10   Q.    Did you learn that any Nazi flags were

11   found at Mr. Rathbun's house?

12   A.    I have not learned that there were some

13   found, but mostly because I haven't been briefed on

14   what was found at all.

15   Q.    Did you learn about any pictures of

16   Hitler being around Mr. Rathbun's house?

17   A.    I've had no discussions with anyone on

18   the case of any of what was found in the house at

19   all.  I can't answer any of those questions.

20   Q.    You've testified before as a witness in a

21   probable cause hearing, in previous cases?

22   A.    This is the first time I've testified in

23   a preliminary hearing.

24   Q.    So no knowledge of the fact that no

25   anti-Semitic literature was found?  Places of

1    synagogues, mosques, religious sites, none of that

2    you're aware of was found?

3                    MR. BRESLOW:  Your Honor, that's been

4    asked and answered.

5                    THE COURT:  Yeah, it really has been

6    asked and answered.  He said he doesn't know what,

7    if anything, was found.

8         Q.    Did you learn what devices were taken out

9    of the house?

10        A.    I'll have the same answer.  I haven't

11   discussed with Agent McGonigle or any other law

12   enforcement personnel any of the details or

13   specifics of any items that were found in the house.

14        Q.    So for example, you didn't learn that

15   Mr. Rathbun does not own a computer?

16        A.    No, I did not.

17        Q.    The search warrant was for the person of

18   Mr. Rathbun as well, correct?

19        A.    Yes.

20        Q.    Did you witness any tattoos on

21   Mr. Rathbun?

22        A.    I was not present on the search location.

23   The closest I got to the residence was probably a

24   few hundred yards away, and I could only see the

25   activities of the individuals who were outside

1    standing in the lawn.

2         Q.    In your training and experience in prior

3    cases with white supremacists, is it true that white

4    supremacists have a predilection for tattoos?

5                   MR. BRESLOW:  Objection, your Honor.

6                   THE COURT:  Sustained.

7         Q.    Have you seen tattoos in prior cases on

8    white supremacists?

9                   MR. BRESLOW:  Same objection, your

10   Honor.

11                  THE COURT:  Sustained.

12        Q.    Were you made aware of any bomb making

13   items that were found in Mr. Rathbun's home?

14                  MR. BRESLOW:  Same objection, your

15   Honor.

16                  THE COURT:  I'm going to overrule

17   that objection.

18        A.    I'm unaware of any bomb making materials

19   found, but the answer to that, I haven't discussed

20   any of the specifics with Agent McGonigle about any

21   of the items that were found.  So I'm not saying

22   that they weren't there.  I just don't know.

23        Q.    You testified as to an interview of

24   Mr. Rathbun at his home, correct?

25        A.    Yes, I read the 302 drafted by Special

1    Agent McGonigle.

2          Q.    Correct.  And that is -- let me ask you

3    this.  That interview, was it audio recorded or

4    video recorded to your knowledge?

5          A.    I do not believe it was audio or video

6    recorded.

7          Q.    Now, does the FBI have a protocol about,

8    when a target is being interviewed, whether it

9    should be audiotaped or videotaped?

10         A.    Yes, the FBI does.

11         Q.    And what does the FBI say about

12   audiotaping and videotaping interrogations?

13         A.    The FBI has a policy that custodial

14   interviews of individuals are audio and video

15   recorded unless there's, you know, a reason to do

16   otherwise, and it has to be approved by a higher

17   level.

18         Q.    Here that didn't happen, right?  As far

19   as you know, it was not audiotaped or videotaped?

20         A.    Yes.

21         Q.    And of course in this day and age we all

22   have smartphones, we all have devices that can both

23   audiotape and videotape in our pockets, correct?

24         A.    Many, most individuals I would agree have

25   smartphones today that have that capability to

1      record.

2            Q.    And you certainly did, on the perimeter

3      of the scene, you had your smartphone with you.  You

4      could have audiotaped or videotaped that interview

5      with Mr. Rathbun if you had been asked to?

6            A.    I mean, that's a hypothetical.  My job on

7      that search that day was not to be involved in the

8      things going on in the house.  So the answer as far

9      as me being able to video record, I wasn't present.

10           Q.    So for example, where you testified in

11     response to Mr. Breslow's question about Mr. Rathbun

12     seeming like he was about to cry, if we had

13     audiotape, videotape, we could see what the context

14     of that was and exactly what happened, would you

15     agree with me?

16                 MR. BRESLOW:  Objection, your Honor.

17     Beyond the scope of the preliminary hearing at this

18     point.

19                 THE COURT:  Yeah.  Again, I think the

20     point has been made, Mr. Watkins.  So I'm going to

21     ask you to move on.  I'm going to sustain the

22     objection and ask you to move on.

23           Q.    Two more questions about the statement.

24     It is true, is it not, that Mr. Rathbun denied

25     involvement, not only with placing the gas can, but

1    also any involvement with white supremacist groups?

2          A.    Could you refresh my memory?  Is this

3    coming from the 302 interview of the defendant?

4          Q.    Yes.  I believe that it's also in the

5    complaint.

6          A.    Okay.  Yes, I believe that he denied

7    having anything to do with the device, and then also

8    denied viewing anti-Semitic websites.

9          Q.    Does that report also indicate that he

10   consented to a DNA swab?

11         A.    Yes, the report does state that.

12         Q.    You talked about gas that was found in

13   the garage and the gas cans.  Mr. Rathbun's mother

14   was also interviewed as part of the investigation,

15   were you aware of that?

16         A.    I believe I did hear that his mother was

17   interviewed, but I was not provided with any of the

18   details of what she stated.  I do believe that she

19   was interviewed though.

20         Q.    So then you wouldn't know whether she

21   corroborated Mr. Rathbun's statement about the gas

22   being for tools that they had at the house?

23         A.    No.  All I could say is I knew she was

24   interviewed, but I didn't know any of the details of

25   what she said or didn't say.

1          Q.     What you can say is that they have a

2     fairly small house on a fairly large plot of land,

3     is that true?

4          A.     I mean, I guess the size of the plot is

5     all relative, but they definitely have a yard with

6     grass that I'm sure they mow, if that's what you're

7     asking.

8          Q.     I want to move on now to talking about

9     the gas can itself and the circumstances under which

10    it was found.  You testified about Molotov

11    cocktails, and that's something you learned in your

12    training and experience, correct?

13         A.     Yes, I've had some trainings describing

14    Molotov cocktails.

15         Q.     Can you describe for us once again what

16    the salient features, the important features of a

17    Molotov cocktail are as you understand?

18         A.     A container which could hold an

19    explosive, generally a liquid, that can be thrown

20    and explode.

21         Q.     And I think you said before it also has

22    to be breakable, right?

23         A.     Yes, that's correct.

24         Q.     And the paradigm is a glass bottle with a

25    wick in it that has some ignitable liquid in it that

1    can be lit, thrown, it breaks, the fluid goes all

2    over, wherever it's aimed for, and ignites because

3    the wick is on fire.  Is that a Molotov cocktail?

4         A.    Yeah, that sounds like a good general

5    description of a Molotov cocktail.

6         Q.    So I want to put up for you now one of

7    the pictures from Exhibit 2.  This is the Longmeadow

8    Police Department report this particular picture

9    came from.  Are you seeing it?

10        A.    Yes, I do see that photograph.

11        Q.    And that is the gas can at issue here,

12   the one you described with the blood on the handle,

13   correct?

14        A.    Yes.

15        Q.    So that container obviously is not glass,

16   right?

17        A.    The container is plastic.

18        Q.    And it can't be thrown and broken, is

19   that fair to say?

20        A.    I would say generally that plastic is not

21   as breakable as glass.  I can't say that plastic is

22   unbreakable, undestructive, no.  I wouldn't feel

23   comfortable saying that.  I've had plastic things

24   break.

25        Q.    That's true.  But going back to the

1    Molotov definition you talked about, breakable,

2    likely glass, with a wick in it, small, can be

3    thrown against a wall or into a place, right?

4    Knowing that definition, do you think that this gas

5    can qualifies as a Molotov cocktail?

6              MR. BRESLOW:  Objection, your Honor.

7    The statute has its own particular definitions, and

8    the colloquial definition, whether proposed by

9    Mr. Watkins or not, is not pertinent to whether the

10   statutory definition here has been met.

11             MR. WATKINS:  I have a variety of

12   answers to that, your Honor.

13             THE COURT:  Go ahead, Mr. Watkins.

14   Let me hear from you.

15             MR. WATKINS:  I'm sorry?

16             THE COURT:  You say you have a

17   variety of answers to that.

18             MR. WATKINS:  Answer number one is

19   that Mr. Breslow specifically asked about this

20   witness' opinion about it being a Molotov cocktail,

21   so I think he opened the door there.  The Molotov

22   cocktail allegation is repeated in the complaint

23   affidavit as it is in the search warrant affidavit.

24   So I think it's more than fair grounds for

25   cross-examination and specifically cross-examination

1    of this witness.

2                    MR. BRESLOW:  Your Honor, if I may

3    respond briefly.

4                    THE COURT:  Briefly.

5                    MR. BRESLOW:  I believe that

6    Mr. Watkins in his first point is referring to my

7    final questions to Special Agent Boucher about

8    whether, based on his training and experience, if

9    that object had contained gasoline and ignited,

10   could it explode and harm others.  I did not use the

11   phrase Molotov cocktail, neither did Special Agent

12   Boucher.

13           The only time that appeared in the direct

14   examination was in reference to the police report

15   where I believe it was another officer, either of

16   the fire department or the police department, who

17   had stated that in his view it appeared to be a

18   Molotov cocktail.  That's the first point.

19           Second point is the term explosive or

20   incendiary device has a particular and very specific

21   meaning in the statute.  It's the statute that your

22   Honor has to determine whether --

23                    THE COURT:  I agree, I have to

24   determine whether or not this devices satisfies the

25   statutory definition of an incendiary device.

1    Again, we've spent a lot of time on things that are

2    really not central to whether or not there's

3    probable cause.

4                    MR. BRESLOW:  And for those reasons

5    we object.

6        Q.    Mr. Boucher, you testified that you have

7    had training and experience in explosives more

8    generally?

9        A.    Yes, I've had some general trainings on

10   explosive.  I would not qualify myself as an expert,

11   nor the special agent to go through extensive

12   training on explosives labeled bomb technicians.  I

13   am not one of those individuals.

14       Q.    So for example, if I showed you this from

15   Exhibit 2 again, this particular can, is there any

16   significance to you that the spout is pointed out of

17   the can rather than pointing into the can?

18       A.    I have no training on the specifics of

19   how a spout is pointed and what direction and the

20   explosive capability that could mean.

21       Q.    One more side note as we're going through

22   this.  You testified about the certification in

23   Exhibit 7 from the manufacturer of the gas can.

24   That's the Scepter affidavit.

25       A.    Yes.

1        Q.    Is it true that the owner of the company

2    also indicated that this particular can, once he

3    observed a picture, was an older can?  It's not in

4    the affidavit.

5        A.    That's what I was looking for.  Yes, I do

6    recall having that conversation in my meetings with

7    the attorneys and Special Agent McGonigle, that this

8    was an older can that wasn't currently manufactured,

9    but I do not see it here on the affidavit.

10       Q.    So as far as you know that is true, it's

11   an older can?

12       A.    Yes, that's my understanding.

13       Q.    Do you know where this particular gas can

14   is right now?

15       A.    The can itself?  No, I do not currently

16   know its location.

17       Q.    You know though that the FBI has a

18   particular division, a particular center that deals

19   with improvised explosives, right?

20       A.    Yes, there's a number of FBI units that

21   deal with explosives.

22       Q.    One of them is the Terrorist Explosive

23   Device Analytical Center, right, TEDAC?

24       A.    Yes, I'm familiar with TEDAC.

25       Q.    They do all kinds of tests on items to

1    see if they qualify as explosive devices, correct?

2         A.    They do all sorts of tests on explosive

3    devices.  What specific unit qualifies something as

4    an explosive, that I can't answer on the spot here,

5    but they do testing.

6         Q.    What you know is that the FBI has means

7    to test this particular gas can and also simulate

8    tests of an exploding gas can, correct?

9         A.    Yes.

10        Q.    Alcohol, Tobacco and Firearms, they are

11   also an agency that deals with explosives on

12   occasions?

13        A.    Yes, my general understanding is that

14   they do.  The specifics of them I can't really

15   answer to.

16        Q.    Are you familiar that they do their own

17   testings of particular vessels and containers in

18   their investigations?

19        A.    I generally know that they have a

20   laboratory and have that capability.  I have never

21   directly worked with them on an investigation.  So I

22   can't speak to the specifics.

23        Q.    Do you know that they've done an

24   experiment with a five-gallon can where it was

25   filled with gas to try to determine what happens

1    when it's lit on fire?

2                    MR. BRESLOW:  Objection, your Honor,

3    based on the witness' prior statement.

4                    THE COURT:  Again, I'm not sure what

5    this would have to do with the question that's in

6    front of the Court, Mr. Watkins, whether or not the

7    device is effective.  The question is what the

8    intent is of the person.  What the intent is, that's

9    really what we're looking at.

10                    MR. WATKINS:  Your Honor, I would

11   also say at issue here is whether it qualifies as an

12   explosive device under the statute.

13                    THE COURT:  Sure.

14                    MR. BRESLOW:  Your Honor, I'll just

15   add that each of the statutes as charged and set

16   forth in the complaint allege attempts as well as

17   completed acts.

18                    THE COURT:  Right.

19                    MR. WATKINS:  Nevertheless, one has

20   to -- the government must prove and show on a

21   probable cause basis that a particular device

22   qualifies under the statute.

23                    THE COURT:  Yes.

24                    MR. WATKINS:  I'll move on.

25        Q.    Agent Boucher, I want to put up for you

1    Exhibit 10, which was the street view.  Do you

2    recognize this?

3         A.    Yes, I do recognize it.

4         Q.    I'm also going to go back to Exhibit 9

5    which we saw before as well.  Now, both of these

6    exhibits, Exhibit 9 and Exhibit 10, you produced

7    using Google Earth, right?  Or Google Maps, correct?

8         A.    Yes, that's correct.

9         Q.    And you used Google Maps because that's a

10   reliable way to map out and show things, right?

11        A.    You know, with the pandemic I was working

12   from home that day, and that's the mapping software

13   I had available to me.  That's why I used it.

14        Q.    Right.  Again, that is something that

15   it's reliable enough to be able to orient oneself

16   about where things happened, is that fair to say?

17        A.    Yes.

18        Q.    So I'm going to now put in front of you

19   Google Earth, and based on your -- that's very much

20   similar to that map that we just saw as Exhibit 9,

21   right, the overview?

22             MR. BRESLOW:  Your Honor, before the

23   agent answers, I think Mr. Watkins is displaying at

24   least if not introducing a new exhibit.  Although

25   similar, I just want for the record to request that

1    Mr. Watkins somehow create the exhibit so that it

2    can be included as part of the record.

3                    MR. WATKINS:  I wasn't intending to

4    enter it as an exhibit.  It was simply to clarify

5    what the agent told us.

6                    THE COURT:  I don't understand.

7                    MR. WATKINS:  So I am showing --

8    maybe if I can do a few introductory questions and

9    then I'll get to it, and perhaps this will answer

10   the Court's question.

11                   THE COURT:  All right.

12       Q.    Agent Boucher, do you recognize what's

13   displayed on this map?

14       A.    Yes, it appears to be a map of a portion

15   of Longmeadow, Massachusetts.  I see Ruth's House, I

16   see Converse Street.  Yes, it appears to be a

17   similar view of the map we looked at before.

18       Q.    Right.  And you pointed out before on

19   Exhibit 9 this is where the device was located.  You

20   talked about JGS Lifecare, you talked about Genesis

21   House being really over here, you talked about

22   assisted living being over here, correct?

23       A.    Yes.

24       Q.    And then when you made Exhibit 9, you did

25   exactly what I'm doing here, which is the street

1    view aspect of it, right?

2        A.    That's correct.

3              MR. BRESLOW:  Your Honor, I'm sorry.

4    With respect to Mr. Watkins, I just don't know how

5    the references to here and here and there --

6              THE COURT:  It won't show up on the

7    record, Mr. Watkins.

8              MR. WATKINS:  I'll try do better on

9    identifying.

10       Q.    This is the street view from the corner

11   of Converse and Ruth's House Drive, similar to what

12   was in Exhibit 10, correct?

13             MR. BRESLOW:  Your Honor, I'm going

14   to object to Mr. Watkins using this without -- we've

15   had an opportunity to prepare exhibits and share

16   them.  I don't mind a brief recess for Mr. Watkins

17   to prepare and mark the exhibits.  I'm likely not to

18   have any objection to their introduction, but I just

19   think proceeding this way is highly problematic.

20             THE COURT:  So Mr. Watkins, is there

21   a reason why we can't go back to Exhibits 9 and 10?

22             MR. WATKINS:  Yeah, let's try it that

23   way then.

24             THE COURT:  Thank you.

25       Q.    I'm showing you now Exhibit 9, and I'm

1    going to focus in here a little bit.  Mr. Breslow

2    pointed out where that pin is.  That's a pin that

3    you put in on Google Maps, right?

4                    THE COURT:  We're not seeing

5    Exhibit 9 on the screen.

6                    MR. WATKINS:  Oh, I'm sorry.  Are you

7    seeing Exhibit 9 now?

8                    THE COURT:  Yes.

9        Q.    So Agent Boucher, you see where this gas

10   can was placed?

11       A.    Yes, I see the pin on the corner of

12   Converse and Ruth's, which I placed there to

13   approximately show the location of the yellow gas

14   can.

15       Q.    Now I want to direct you to complaint

16   paragraph 18.

17       A.    Yes, I'm there.

18       Q.    That indicates that this gas can was

19   placed approximately 50 yards from the Ruth's House

20   facility, right?

21       A.    Yes.

22       Q.    So on the map you pointed out Ruth's

23   House being up at the top of this circle, is that

24   correct?

25       A.    That is correct.

1        Q.    Have you yourself walked the distance

2    from here up to Ruth's House?

3        A.    No, I have not.  I have not walked it,

4    nor have I measured the distance.

5        Q.    In the affidavit it is listed as 50

6    yards.  To your knowledge and experience -- well,

7    let me ask you this.  Have you ever been to the

8    corner of Converse Street and Ruth's House Drive?

9        A.    I have driven on Converse Street so I've

10   driven by it, but I have not specifically stopped

11   and investigated that particular corner.

12       Q.    So would it surprise you that Ruth's

13   House Assisted Living facility is actually

14   two-tenths of a mile away from Converse Street?

15       A.    I mean, if you're telling me that's how

16   far away it is, I'm guessing it wouldn't surprise

17   me.  But no, I have not.

18       Q.    And in the affidavit, paragraph 18, that

19   was what Agent McGonigle was referring to was the

20   Ruth's House Assisted Living facility, correct?

21       A.    It says Ruth's House here in paragraph 18

22   and it says it is 50 yards from Converse Street.

23   That does read that.

24       Q.    So if it were actually .2 miles away,

25   that would be an error in the complaint affidavit,

1     right?

2           A.     There appears there's some sort of

3     discrepancy, yes, if what you're saying is accurate

4     and it is two-tenths of a mile.

5           Q.     So then going back to Exhibit 10, here is

6     where the gas can was found behind this tree.

7           A.     I'm sorry.  I can't see.

8           Q.     Oh, I'm sorry again.  Behind this tree is

9     where the gas can was put?

10          A.     Yes.

11          Q.     You've noted that there's housing over

12    here to the right of the picture?

13          A.     Yes, that's correct.  The housing that

14    you're pointing to with the pointer, that would be

15    described as Genesis House from my understanding.

16          Q.     And this area over here, no houses there?

17    That's just woods quite a ways down, is that

18    correct?

19          A.     I believe that is wood frontage there,

20    and behind that kind of, that's where the nursing

21    home is.

22          Q.     And you can see that up there some many

23    yards away, true?

24          A.     Yes.

25          Q.     So the two violations that you're

1   testifying to here, 844(d) and 844(i), they require

2   intent to kill, injure or intimidate a person.  What

3   is the basis of your conclusion that placing a gas

4   can here could kill, injure or intimidate someone?

5      A.   So the sidewalk which you can see in the

6   image you're showing I would say is approximately

7   six feet away from where the gas can was placed, and

8   the gas can was probably also placed maybe

9   approximately six feet away from the street and

10  entrance to Ruth's House.

11          From reading the complaint and affidavit,

12  it is clear that the grounds of Ruth's House were

13  used by residents to walk, and that's an entrance

14  that I'm sure employees and visitors and residents

15  use to come and go, and that sidewalk along Converse

16  Street I'm sure is used by many town residents to

17  walk.  So I would say that is in the vicinity of

18  those thoroughfares I just described.

19     Q.   I understand from the complaint and your

20  testimony that the government's theory is someone

21  tried to light that can and was unsuccessful, is

22  that correct?

23          MR. BRESLOW:  I'm sorry.  I just

24  didn't understand the last part of Mr. Watkins'

25  question.  Could Mr. Watkins please repeat it before

1    the witness answers, as to the government's theory?

2         Q.    As I understand the government's theory

3    as outlined in the complaint, an individual tried to

4    light the paper in that spout with the intent to

5    blow up that can at that site, is that true?

6         A.    I think the individual who lights a wick

7    inside a gas can does have the intent to set off the

8    gasoline inside the can, to have it ignite.

9         Q.    So the person that lit off this wick, in

10   this case a small piece of paper in that gas can,

11   would have been close by himself, is that correct?

12        A.    I don't have the training or expertise to

13   speak to if somebody has six inches of paper wick,

14   how long that would take to burn down, to touch the

15   gasoline.  I don't have that training or expertise

16   to be able to answer that question.

17        Q.    But you burn pieces of paper yourself,

18   right?  We all have.

19        A.    Yes, I've set paper on fire.

20        Q.    In order to place -- if one were to drive

21   to this location in a car, there is no place to

22   really park on Converse Street?  As you mentioned,

23   it's a very busy street, is that correct?

24        A.    The street doesn't have a designated

25   parking area, no.

1        Q.      There are parking spaces up here as we

2    can see in the picture, right?

3        A.      Yes, I think there's many parking areas

4    on the JGS campus.

5        Q.      But there's no place to park here?  A car

6    stopped here would simply block an entrance or an

7    exit, is that true?

8        A.      If you were to put your car there, it

9    would block.  Stop it and put it in park, yes, it

10   would obstruct the entrance.

11       Q.      So for example, a person stopping there,

12   getting out of the car to get in the back to get a

13   gas can, putting it over there and lighting it, and

14   then coming back to the car, that would block that

15   driveway?

16       A.      Yes.  I mean, what you described I would

17   think could be done fairly quickly, but for a short

18   time it would either obstruct the driveway or, you

19   know, they could have pulled their car along the

20   sidewalk.  I mean, there's many places somebody

21   could park their car there.  It's pretty wide open,

22   but they would have to have left their car.

23       Q.      So where else would they have parked

24   their car?

25       A.      I mean, you could have pulled right up on

1    the sidewalk there.  You could have parked on the

2    grass strip there along Converse.  They could have

3    pulled into Ruth's House and parked along the stop

4    sign there.  You know, I think this isn't a

5    congested thoroughfare that there's limited parking

6    like an inner city.  This is pretty wide open.

7         Q.    Just to be sure, you testified you agreed

8    with Agent McGonigle's characterization of Converse

9    Street as being a busy thoroughfare, correct?

10        A.    In the relative terms of Converse Street

11   being a main street in Longmeadow, Massachusetts,

12   yes.  Relative to an LA highway, no.

13        Q.    Lastly, the actual contents of the gas

14   can were emptied out by the Longmeadow Police

15   Department?

16        A.    That is correct.

17        Q.    Do you know where the contents of the gas

18   can are?

19        A.    The last I was informed, the contents of

20   the gas can were currently pending testing to

21   confirm the liquid.

22        Q.    Right, to find out what exact -- so

23   today, other than the chief of the fire department

24   saying it smells like gasoline, you have no personal

25   knowledge of what the substance in the can actually

1    is?

2         A.    My recollection is the deputy chief of

3    the police department said in their training and

4    experience believed it was gasoline, but other than

5    that, I have no specific knowledge of the actual

6    chemical compound of the substance.

7         Q.    So for example, if it were water in

8    there, that would no longer be an explosive device,

9    is that true?

10        A.    Again, I'm not a chemist, but two parts

11   to your question there.  One is if it was water, I

12   believe they would have been able to tell based on,

13   you know, the feel and smell that it was not

14   gasoline.  Gasoline has a very distinct odor.  As

15   far as -- I'm sorry.  Could you repeat the question

16   again?

17        Q.    No, I think that's enough.  The answer is

18   we don't know.  Nobody knows what's in that can, is

19   that correct?

20             MR. BRESLOW:  Objection, your Honor.

21        Q.    Nobody involved in the investigation has

22   come to a conclusion about what is in that can, is

23   that true?

24             MR. BRESLOW:  Same objection, your

25   Honor.

1          THE COURT:  There is some evidence

2     about what is in the can.  There is some evidence.

3     You may argue there's not sufficient evidence, but

4     there is some evidence.

5          MR. WATKINS:  I have no further

6     questions.

7          THE COURT:  All right.  I want to

8     hear from counsel, but I'm concerned that we have a

9     limited -- we may have a somewhat limited window of

10    opportunity for Mr. Rathbun to observe these

11    proceedings.  Ms. Rivera, do you have any further

12    information on how long we can go before we're going

13    to be cut off by the Hampden County House of

14    Correction?

15         THE CLERK:  Your Honor, the last time

16    that I emailed with them, they said we have three

17    hours, which means we have approximately 36 minutes

18    left.

19         THE COURT:  So counsel, we must do

20    this in Mr. Rathbun's presence.  Mr. Breslow, do you

21    have any further questions?  But I'm reminding you

22    that we are limited in our time.

23         MR. BRESLOW:  Right.  Your Honor, I

24    really want to balance Mr. Rathbun's right to be

25    present for this and the Court's concern for time.

1    I have just a few, very few questions, if I may,

2    your Honor.  Maybe about five minutes worth, if

3    that.

4              THE COURT:  Five is going to be a

5    little long.  If you can make it quicker than that.

6              MR. BRESLOW:  Sure, I will.

7              THE COURT:  Thank you.

8              MR. BRESLOW:  Can I just take a half

9    a minute to orient myself, your Honor?

10            THE COURT:  Yes.  Yes, Mr. Rathbun.

11   Ms. Rivera, let's let Mr. Rathbun speak briefly.

12           CORRECTIONAL OFFICER:  Hi there.  If

13   you need a little more time, that's fine.

14           THE COURT:  So we will have up to 45

15   minutes more?

16           CORRECTIONAL OFFICER:  Sure, whatever

17   you need.

18           THE COURT:  Thank you very much, sir.

19           THE DEFENDANT:  Thank you, ma'am.

20           THE COURT:  Thank you, Mr. Rathbun.

21   Mr. Breslow, proceed.

22        REDIRECT EXAMINATION BY MR. BRESLOW

23     Q.   Special Agent Boucher, do you remember

24   being asked a series of questions by Mr. Watkins

25   about white supremacy and neo-Naziism, all generally

1    apparently relating to intent in his

2    cross-examination?

3         A.    Yes, I do recall that.

4         Q.    So I just want to ask you a few basic

5    questions again.  With respect to the device,

6    approximately how many feet was it located to a

7    widely used pedestrian walkway, the sidewalk along

8    Converse Street?

9         A.    I would say approximately six feet.

10        Q.    And approximately how many feet was it

11   located to the main entrance of JGS that leads to

12   Ruth's House and the nursing home and other

13   facilities?

14        A.    Again I would say approximately six feet.

15        Q.    Do you remember being asked questions

16   concerning Molotov cocktails and breakable

17   containers, including glass containers?

18        A.    Yes, I do recall.

19        Q.    Recognizing that you're not a specialist

20   in this area, do you have an opinion based on your

21   training and experience that if ignited, if this

22   five-gallon container did consist of gasoline and

23   the gasoline did ignite, that it could break and

24   explode?

25        A.    Yes.  Gasoline is dangerous and

1    explosive.  You know, I think many individuals have

2    experience with accidentally setting themselves on

3    fire with gasoline and causing explosion by

4    accident.

5        Q.   Do you remember being asked a series of

6    questions concerning what items might be found at

7    the search site, including hard copies of white

8    supremacist literature and other evidence indicating

9    intent to harm other people?

10       A.   I do recall those questions.

11       Q.   And just to be clear, have you seen the

12    search warrant inventory or any search warrant

13    photos, or do you have any other information about

14    what the agents actually gathered from the house?

15       A.   No, I have seen none of those things.  I

16    have no information about any of the items that were

17    seized or photographed or viewed on site during the

18    search.

19       Q.   And were you aware that some computer

20    equipment was taken from the home or from

21    Mr. Rathbun himself personally?

22       A.   No, I'm not.  I was not informed what

23    computer devices were located in the residence, nor

24    what was seized.

25       Q.   Okay.  Do you remember being asked

1    certain questions concerning Mr. Rathbun's potential

2    participation on the platforms that were specified

3    in the search warrant affidavit?

4         A.    Yes, I do recall it.

5         Q.    I want to focus your attention on the

6    criminal complaint, in particular footnote one, page

7    five.  Do you see that?

8         A.    Yeah, it's on the screen.

9         Q.    Okay.  And can you just read it aloud to

10   the Court and to the public?

11        A.    "The FBI has not yet determined whether

12   Rathbun has been involved in any way with the

13   organization or in any other white supremacist

14   activities.  The FBI's investigation is ongoing."

15        Q.    And is that true -- this was written on

16   April 15th, 2020, but is that statement still true

17   today as to both of those sentences?

18        A.    Yes, to my understanding and knowledge

19   both of those statements are still true.

20        Q.    And do you remember being asked questions

21   about the search warrant affidavit, paragraph 123,

22   and in particular whether there were any hard copies

23   of white supremacist material?

24        A.    Yes, I do recall it.

25        Q.    Can you take a look at paragraph 123 of

1    the search warrant affidavit again?

2         A.    Give me one minute.  I have it in front

3    of me.

4         Q.    And does the first sentence in the

5    paragraph state that, "Individuals frequently use

6    the internet and computer equipment to possess,

7    collect, receive, distribute, store and print

8    material relating to their particular ideologies and

9    interests"?

10        A.    Yes, it does read that.

11        Q.    That's a fair statement, you would agree?

12        A.    Yes.

13        Q.    Do you remember being asked questions

14   about custodial interviews and the FBI's policies to

15   record custodial interviews?

16        A.    I do recall those questions.

17        Q.    Now, you weren't present for the actual

18   interview of Mr. Rathbun, correct?

19        A.    No, I was not.

20        Q.    However, was Mr. Rathbun arrested before

21   the interview?

22        A.    No, he was not.

23        Q.    Was he arrested -- do you know when in

24   fact he was arrested?

25        A.    Based on the context of reading the

1    complaint, I can see that information taken from the

2    interview was used in it, so from the sequencing

3    there, my understanding is he was arrested after the

4    interview was conducted.

5                MR. BRESLOW:  I just want to consult

6    with my cocounsel for a moment, your Honor, but I

7    don't believe I have any other questions.  Can I

8    just consult with Mr. Berkower for a moment?

9                THE COURT:  Yes.  So Ms. Rivera, can

10   you facilitate that?

11               MR. BRESLOW:  No, that's okay.

12   Ms. Berkower can simply send me a text message.

13               THE COURT:  All right.  Mr. Breslow,

14   we're still seeing the complaint affidavit on the

15   screen.

16               MR. BRESLOW:  Am I sharing it, your

17   Honor?  I can't see anybody right now.

18               THE COURT:  I think you are.

19               MR. BRESLOW:  I don't know if

20   Mr. Watkins is sharing it or I am.  Oh, I am.  I see

21   it.  I'm sorry.  I'll stop sharing that, your Honor.

22   I just have one or two questions about the -- your

23   Honor, I have no further questions.

24               THE COURT:  Thank you.  Mr. Watkins,

25   anything further?  It would have to be very brief.

1          MR. WATKINS:  Just as to that last

2     point.

3              RECROSS-EXAMINATION BY MR. WATKINS

4          Q.    So you understand that at that search on

5     April 15th, you and Agent McGonigle and all the

6     other agents had a search warrant to search the

7     home, his house, and the person of Mr. Rathbun, is

8     that correct?

9          A.    Yes, that is correct.

10         Q.    So Mr. Rathbun was going to be held there

11    in order to execute the search warrant, is that

12    correct?

13         A.    From reading --

14              MR. BRESLOW:  Objection, your Honor.

15              THE COURT:  I'm sorry.  Did you

16    object?

17              MR. BRESLOW:  I did.  I object to the

18    foundation.  I'm not aware that he has any knowledge

19    about whether or not, if this is the inquiry,

20    whether or not Mr. Rathbun was in custody.  That's

21    really the subject of a suppression hearing, if

22    anything, and I don't think there's a proper --

23              MR. WATKINS:  Mr. Breslow just asked

24    his opinion about whether Mr. Rathbun was in custody

25    or not.

1            MR. BRESLOW:  What I asked was had he

2      been arrested prior to the interview.

3            THE COURT:  Whether he had been

4      arrested formally.

5            MR. WATKINS:  Of course the issue is

6      whether he was in custody rather than whether he was

7      arrested, but we'll leave that for another day.

8            THE COURT:  Well, he waived his

9      Miranda rights, so I don't know if that really is

10     the issue, Mr. Watkins.  Your point was if he was in

11     custody, they were required to record the interview.

12            MR. WATKINS:  Exactly.

13            THE COURT:  Okay.

14            MR. BRESLOW:  And my only point, your

15     Honor, is that may be a proper subject for a

16     suppression hearing, but it's certainly not here.

17            THE COURT:  In any event,

18     Mr. Watkins, I think it's a fairly peripheral

19     question with respect to probable cause.

20            MR. WATKINS:  I only went into it

21     because Mr. Breslow did, but I think you're right.

22            THE COURT:  Okay.  So counsel, this

23     will be the government first, so I will hear from

24     you, Ms. Berkower, on the question of probable

25     cause.

1    UNITED STATES OF AMERICA

2    DISTRICT OF MASSACHUSETTS

3    CITY OF SPRINGFIELD

4

5

6

7         I, Sarah L. Mubarek, Registered Professional

8    Reporter, hereby certify that the foregoing is a

9    true and accurate transcript of my stenographic

10   notes to the best of my knowledge and ability.

11

12

13                              /s/Sarah L. Mubarek
14                              Sarah L. Mubarek
                                Registered Professional Reporter
15

16
     DATED:  June 12, 2020
17

18

19

20

21

22

23

24

25